ALBERT L. AND CHARLOTTE K. DOUGHERTY, PETITIONERS *v.* COMMIS-
SIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2400–69. Filed September 18, 1973.

*Thomas J. Donnelly, Jr.,* and *John A. Hazelwood,* for the peti-
tioners.
*Robert T. Hollohan,* for the respondent.

TANNENWALD, *Judge:*\* Respondent determined a deficiency of
$412,241.87 in petitioners' income tax for 1963. Petitioners contest the
inclusion in their gross income for that year of any amount under sec-
tion 951(a)(1)(B).[1]

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and
attached exhibits are incorporated herein by this reference.

Petitioners are husband and wife whose legal residence was in Paoli,
Ind., when they filed their petition in this case. They filed a joint Fed-
eral income tax return for the calendar year 1963 [2] with the district
director of internal revenue, Chicago, Ill. Charlotte K. Dougherty is a
party to this case only because she filed the joint return with her hus-
band. Albert L. Dougherty will hereinafter be referred to as the
petitioner.

Petitioner was the president and sole shareholder of Dougherty
Overseas, Inc. (hereinafter Liberia). Liberia was a corporation organ-
ized on September 12, 1956, under the laws of the Republic of Liberia
for the purpose of engaging in the construction business outside the

---

\*Pursuant to a notice of reassignment sent to counsel for both parties, and to which
no objections were filed, this case was reassigned by the Chief Judge on Dec. 11, 1972,
from Judge Austin Hoyt to Judge Theodore Tannenwald, Jr., for disposition.

[1] All references are to the Internal Revenue Code of 1954, as amended and in effect
during the year in issue.

[2] Unless otherwise indicated, all years specified are calendar years.

United States. Its annual accounting period was the calendar year. Liberia completed its first and only construction project, the building of a road in Afghanistan, during 1962 and was liquidated on October 26, 1965.

Liberia had no ·current earnings and profits during 1963. Its accumulated earnings and profits were $1,887,272.75 as of December 31, 1962, and $1,785,868.18 as of December 31, 1963.

Petitioner was also the sole shareholder of A. L. Dougherty Overseas, Inc. (hereinafter Indiana), a corporation organized in June 1952 under the laws of the State of Indiana. Indiana was engaged in the business of constructing roads and airfields within and without the United States. Its taxable year was the fiscal year ending May 31.

During 1963 and for many years previously, petitioner was engaged as a sole proprietor in the business of road construction in the United States under the name of A. L. Dougherty Co. The proprietorship (hereinafter Company) used the calendar year as its annual accounting period.

In addition to his interest in the three Dougherty construction enterprises, petitioner was the president and owned 60 percent of the capital stock of Illinois Basin Oil Association, Inc. (hereinafter IBOA), a corporation organized on June 20, 1960, under the laws of the State of Delaware. Petitioners' son owned 10 percent of the capital stock of IBOA and the remaining 30 percent was owned by unrelated persons. IBOA was engaged in the business of exploring and drilling for petroleum. Its taxable year was the fiscal year ending June 30.

Indiana, Company, and IBOA were indebted to Liberia in the following amounts at the close of 1962 and 1963:

|  | Dec. 31, 1962 | Dec. 31, 1963 |
|---|---|---|
| Indiana | $74, 495. 22 | $91, 646. 38 |
| IBOA | 62, 000. 00 | 536, 026. 00 |
| Company | 203, 719. 57 | 35, 314. 07 |
| Total | $340, 214. 79 | $662, 986. 45 |

The following transactions took place between Liberia, Indiana, Company, and IBOA during 1963 and 1964:

1. *Indiana.*—In May and October of 1963, Liberia loaned Indiana the sum of $17,151.16. None of that indebtedness was repaid by Indiana to Liberia within 1 year from the time it was incurred.

2. *Company.*—On April 8, 1963, Company repaid in full its then outstanding debt to Liberia ($203,719.57). Between that date and the end of 1963 Liberia made additional loans to Company in the sum of $37,167.07 and Company made repayments to Liberia in the sum of $1,853. During 1964 and within 1 year from the time such indebtedness was incurred, Company repaid Liberia $1,263.31.

3. *Liberia.*—On December 11, 1962, the board of directors of Liberia resolved to make additional loans to IBOA not in excess of $300,000 to be repaid by December 31, 1963, with interest at 4 percent per annum. At that time, Liberia was not actively engaged in business and had idle cash deposited in checking accounts within the United States. The purpose of the proposed loans was to enable IBOA to finance the production of oil on its leasehold (hereinafter referred to as the Lynn lease) in Hopkins County, Ky. It was expected that the loans would be repaid at maturity out of the proceeds of the oil production.

In accordance with the foregoing, Liberia loaned to IBOA the sum of $52,000 on December 30, 1962, $10,000 on December 31, 1962, and further sums aggregating $280,000 between January 2 and March 7, 1963. IBOA gave Liberia its 90-day interest-bearing promissory notes.

Because IBOA needed additional financing for its production on the Lynn lease, Liberia's board of directors on April 5, 1963, authorized additional loans to IBOA not in excess of $250,000 to be repaid by December 31, 1963, with interest at 4 percent per annum. Pursuant to this resolution, Liberia loaned IBOA the additional sum of $199,826 between April 8 and July 15, 1963. IBOA gave Liberia its interest-bearing notes due on or before December 31, 1963.

On October 15, 1963, IBOA made a payment of $5,800 for the account of Liberia, which was credited on Liberia's books against the amounts owed by IBOA.

By July 8, 1963, the oil wells on the Lynn lease proved to be less productive than previously expected. Petitioner had been advised by counsel that Liberia's loans to IBOA should be repaid within 1 year from the time they were incurred. Petitioner decided that IBOA should sell its Lynn lease in order to raise the money for the repayment of the loans from Liberia.

On August 18, 1963, IBOA approached Humble Oil & Refining Co. (hereinafter Humble) with an offer to sell the Lynn lease. Humble expressed its interest and proceeded to make its evaluation of the Lynn lease. IBOA made available to Humble its facilities and data for the purpose of the evaluation, which was completed in October 1963.

At a meeting held in December 1963, Humble offered $450,000 for the Lynn lease. Petitioner, as president of IBOA, demanded $750,000. Petitioner was satisfied that the lease was worth at least $750,000 and that Humble would eventually pay that price. He, therefore, rejected Humble's offer of $450,000 and decided that IBOA should wait for Humble to raise its offer to $750,000. Liberia was also satisfied that IBOA's Lynn lease was worth at least $750,000 and that it would not be prudent business practice to force IBOA to sell at a lower price in order to effect an immediate repayment of Liberia's loans.

IBOA's balance sheet as of December 31, 1963, was as follows:

Assets:

| | | |
|---|---:|---:|
| Cash | $80, 859. 66 | |
| Accounts receivable | 3, 790. 65 | |
| Deferred expenses | 4, 594. 74 | |
| Total current assets | | $169, 245. 05 |
| Investment in nonproducing leases | 71, 854. 82 | |
| Leasehold estates, producing leases | 3, 492. 33 | |
| Equipment (depreciated) on producing leases | 157, 051. 00 | |
| Office furniture and fixtures | 984. 04 | |
| Field equipment (depreciated) | 3, 294. 46 | |
| Total other assets | | 236, 676. 65 |
| Total assets | | 405, 921. 70 |

Liabilities:

| | | |
|---|---:|---:|
| Accounts payable | 9, 827. 69 | |
| Account payable—A. L. Dougherty Co | 96, 285. 48 | |
| Account payable—A. L. Dougherty Overseas, Inc. (Liberia) | 536, 026. 00 | |
| | | 642, 139. 17 |
| Deficit | | (266, 217. 47) |
| Capital stock | | 30, 000. 00 |
| Total liabilities and capital | | 405, 921. 70 |

On July 14, 1964, IBOA and Humble executed a contract for the sale of the Lynn lease. Humble agreed to pay IBOA $310,000, and IBOA agreed to convey to Humble the Lynn lease subject to a reserved production payment of $440,000 in favor of IBOA. The production payment was to bear interest upon the unliquidated balance at the rate of 5¼ percent per annum from the date of closing. Closing took place on September 1, 1964.

On October 20, 1964, Liberia's board of directors considered the question of whether it would continue to permit Liberia's loans to IBOA in the amount of $536,026 to remain outstanding. The board was advised that IBOA was then in a position to repay its loans. Liberia's directors resolved to demand payment from IBOA prior to December 31, 1964.

On December 31, 1964, IBOA paid in full its outstanding indebtedness to Liberia.

On April 15, 1968, petitioner notified the respondent of his election, in the event he were to be taxed on any increase in Liberia's earnings invested in U.S. property for 1963, to be taxed on the applicable amount of such increase as if he were a domestic corporation, as provided in section 962.

On April 29, 1968, petitioner filed with the district director of internal revenue, Chicago, Ill., a document entitled "Election of Sole Shareholder of Dougherty Overseas, Inc., A Liberian Corporation As To Annual Accounting Period Pursuant To Revenue Procedure 63–7." In this document petitioner stated that he "elects a fiscal year ended August 31, beginning with the year 1962 for Dougherty Overseas, Inc. [Liberia]. This is a protective election, since the annual accounting period for Dougherty Overseas, Inc. had previously been ended on August 31 of each year." Respondent denied this election solely for the reason that it was not filed with petitioners' tax return for 1962 or, in respondent's opinion, within a reasonable time thereafter.

Petitioners' income tax return for 1963, which was timely filed, contained no reference to Liberia or to any amount includable in their income under section 951(a).

In a statutory notice of deficiency sent to the petitioners, respondent stated:

It is determined that Albert L. Dougherty's pro rata share of the increase in earnings invested in United States property by Dougherty Overseas, Inc. (a Liberian Corporation), a controlled foreign corporation, for the year 1963 is $531,027.92. Accordingly, said amount is includable in the gross income of Albert L. Dougherty for 1963. Sections 951 and 956 of the Internal Revenue Code of 1954. Details of computation are as follows.

1. Aggregate investment in United States property on December 31, 1963:
Obligations of:

| | | | |
|---|---|---|---|
| Illinois Oil Basin [sic] Association, Inc | | [3] $479, 826. 00 | |
| A. L. Dougherty Overseas, Inc. (Indiana) | | [4] 17,151.16 | |
| A. L. Dougherty Co. (not incorporated) | [5] $37, 167. 07 | | |
| Less: | | | |
| Applicable repayments | [6] (3, 116. 31) | 34, 050. 76 | |
| Total | | 531, 027. 92 | |

2. Current and accumulated profits on December 31, 1963 ........ $1, 785, 868. 18

3. Amount of earnings invested in United States property on December 31, 1963 which would constitute a dividend if distributed on such date (lesser of item 1 or item 2) .......... 531, 027. 92

4. Aggregate investment in United States property on December 31, 1962 which would constitute a dividend if distributed ... 0

5. Foreign corporations [sic] increase for 1963 in earnings invested in United States property (item 3 less item 4) ............ 531, 027. 92

6. Pro rata share of Albert L. Dougherty (100%) ............ $531, 027. 92

[3] This is the sum of Liberia's loans to IBOA during 1963. See p. 919 *supra*.

[4] This is the sum of Liberia's loans to Indiana during 1963. See p. 918 *supra*.

[5] This is the sum of Liberia's loans to Company during 1963. See p. 918 *supra*.

[6] This is the sum of Company's repayments to Liberia during 1963 ($1,853) and 1964 ($1,263.31) applicable to indebtedness which Company incurred in 1963 and repaid within 1 year. See p. 918 *supra*

922

The ultimate issue involved herein is whether petitioners must include any amount in their gross income for 1963 under section 951(a) (1)(B) [7] as representing Liberia's increase in earnings invested in U.S. property for such year. Several subsidiary questions are involved: [8] (1) Whether earnings and profits of Liberia accumulated prior to January 1, 1963, are, as a matter of statutory construction, to be taken into account in determining that corporation's "increase in earnings invested in United States property" for the calendar year 1963; (2) whether, if such is the proper construction, the applicable statutory provisions [9] are constitutional and, additionally, whether subpart F is, as a general proposition, unconstitutional; (3) whether Liberia had a fiscal year ending on August 31 rather than December 31 for the purposes of subpart F; (4) assuming that pre-1963 earnings are properly taken into account, what is the proper measure of the increase in Liberia's investment in U.S. property for calendar year 1963, and particularly whether certain loans made by Liberia constituted such investment; and (5) whether petitioner made an effective election under section 962 to be taxed as a domestic corporation with respect to the amount, if any, includable in his gross income under section 951(a)(1)(B).

We deal with these questions seriatim and in so doing wend our way through the relatively uncharted passages of subpart F, a task which we have previously described as one requiring us to penetrate "the veil of confusion" in order to "discharge our duty of extraction." See *Clayton E. Greenfield*, 60 T.C. 425 (1973).

---

[7] SEC. 951. AMOUNTS INCLUDED IN GROSS INCOME OF UNITED STATES SHAREHOLDERS.

  (a) AMOUNTS INCLUDED.—

    (1) IN GENERAL.—If a foreign corporation is a controlled foreign corporation for an uninterrupted period of 30 days or more during any taxable year beginning after December 31, 1962, every person who is a United States shareholder (as defined in subsection (b)) of such corporation and who owns (within the meaning of section 958(a)) stock in such corporation on the last day, in such year, on which such corporation is a controlled foreign corporation shall include in his gross income, for his taxable year in which or with which such taxable year of the corporation ends—

       *       *       *       *       *       *       *

      (B) his pro rata share (determined under section 956(a)(2)) of the corporation's increase in earnings invested in United States property for such year (but only to the extent not excluded from gross income under section 959(a)(2)).

[8] The parties agree that Liberia was a controlled foreign corporation throughout the period involved herein, that petitioner was Liberia's sole U.S. shareholder during that entire period, and that his pro rata share of any increase in Liberia's earnings invested in U.S. property would be 100 percent.

[9] For a comprehensive discussion of the statutory provisions involved in this case, see Jenks, "Controlled Foreign Corporations Investment in United States Property: A New Dividend Concept," 21 Tax L. Rev. 323 (1966).

## 1. *Applicable Earnings and Profits*

Of immediate concern are sections 951(a)(1)(B)[10] and 956.[11] The former section requires a U.S. shareholder of a controlled foreign corporation to include in gross income "his pro rata share (determined under section 956(a)(2)) of the corporation's increase in earnings invested in U.S. property" for the taxable year. Section 956(a)(1) defines the amount of earnings invested in U.S. property as the aggregate amount of such property held by the foreign corporation at the close of its taxable year "to the extent such amount would have constituted a dividend * * * if it had been distributed."[12]

Petitioners focus on section 951(a)(1)(B) and contend that it requires a controlled foreign corporation's increase in earnings invested in U.S. property to be included in the gross income of its U.S. shareholders only to the extent of such corporation's earnings and profits accumulated after the effective date of subpart F.[13] Since all of Liberia's earnings and profits were accumulated prior to that date (January 1, 1963), petitioners assert that no amount should be includable in their gross income under section 951(a)(1)(B).

---

[10] See fn. 7 *supra.*

[11] SEC. 956. INVESTMENT OF EARNINGS IN UNITED STATES PROPERTY.

(a) GENERAL RULES.—For purposes of this subpart—

(1) AMOUNT OF INVESTMENT.—The amount of earnings of a controlled foreign corporation invested in United States property at the close of any taxable year is the aggregate amount of such property held, directly or indirectly, by the controlled foreign corporation at the close of the taxable year, to the extent such amount would have constituted a dividend (determined after the application of section 955(a)) if it had been distributed.

(2) PRO RATA SHARE OF INCREASE FOR YEAR.—In the case of any United States shareholder, the pro rata share of the increase for any taxable year in the earnings of a controlled foreign corporation invested in United States property is the amount determined by subtracting his pro rata share of—

(A) the amount determined under paragraph (1) for the close of the preceding taxable year, reduced by amounts paid during such preceding taxable year to which section 959(c)(1) applies, from

(B) the amount determined under paragraph (1) for the close of the taxable year.

The determinations under subparagraphs (A) and (B) shall be made on the basis of stock owned (within the meaning of section 958(a)) by such United States shareholder on the last day during the taxable year on which the foreign corporation is a controlled foreign corporation.

(3) AMOUNT ATTRIBUTABLE TO PROPERTY.—The amount taken into account under paragraph (1) or (2) with respect to any property shall be its adjusted basis, reduced by any liability to which the property is subject.

(b) UNITED STATES PROPERTY DEFINED.—

(1) IN GENERAL.—For purposes of subsection (a), the term "United States property" means any property acquired after December 31, 1962, which is—

* * * * * * *

(C) an obligation of a United States person * * *

[12] The section goes on to establish the formula for determining the increase in earnings thus invested for the taxable year and to define "United States property." See fn. 11. *supra.*

[13] The controlled foreign corporation provisions, secs. 951 through 964, compose subpart F of part III, subch. N, ch. 1, subtit. A, of the Internal Revenue Code. By virtue of sec. 12(c) of the Revenue Act of 1962, Pub. L. 87-834, 76 Stat. 960, 1031, they "apply with respect to taxable years of foreign corporations beginning after December 31, 1962, and to taxable years of United States shareholders within which or with which such taxable years of such foreign corporations end."

Respondent focuses on the dividend limitation provision of section 956(a)(1) and argues that the earnings and profits account of the controlled foreign corporation has significance in the operation of section 951 (a) (1) (B) only by way of that provision, which makes no distinction between earnings and profits accumulated before or after December 31, 1962. See also section 1.956–1(b)(1), Income Tax Regs., which makes applicable the usual rules for computing earnings and profits in order to determine whether a distribution constitutes a dividend under section 316.

In our view, the petitioners' concentration on section 951(a)(1)(B) is misplaced. That section merely provides for the includability in the gross income of U.S. shareholders of their pro rata share of the "increase in earnings invested in United States property" for the taxable year. It specifically provides in the parenthetical clause that the amount to be included shall be "determined under section 956(a)(2)," which in turn refers to section 956(a)(1). As a result, it is the proper interpretation of the latter section which will be determinative of the issue before us.

The position of the parties is brought into sharp relief by an examination of the legislative history of section 956(a)(1). The origin of that section can be traced to the following provision of the House bill (H.R. 10650, 87th Cong., 2d Sess., pp. 116–117 (1962)) :

SEC. 953. INVESTMENT OF EARNINGS IN NONQUALIFIED PROPERTY.

(a) GENERAL RULES.—For purposes of this subpart—

(1) AMOUNT OF INVESTMENT.—The amount of earnings of a controlled foreign corporation invested in nonqualified property at the close of any taxable year is the aggregate amount of such property held at the close of the taxable year, *to the extent such amount does not exceed the sum of (A) the earnings and profits for the taxable year, and (B) the earnings and profits accumulated for prior taxable years beginning after December 31, 1962.* [Emphasis added.]

Clearly, if this provision had been retained in the legislation as finally enacted, petitioners' position would be correct. But the section went through a metamorphosis in the Senate, which accepted the language contained in a Treasury draft of proposed changes to the House bill and adopted the language which now appears in section 956(a)(1)—language which, in order to point up the contrast, we again set forth verbatim:

(a) GENERAL RULES.—For purposes of this subpart—

(1) AMOUNT OF INVESTMENT.—The amount of earnings of a controlled foreign corporation invested in United States property at the close of any taxable year is the aggregate amount of such property held, directly or indirectly, by the controlled foreign corporation at the close of the taxable year, to the extent such amount would have constituted a dividend (determined after the application of section 955(a)) [14] if it had been distributed.

---

[14] The parenthetical clause has no application to the instant case.

Commenting on its draft bill, the Treasury stated that "the provision for taxing the increase in investment in certain U.S. property is, with technical changes, substantially the same as in section 13 of H.R. 10650." (Explanation of Amendments Recommended by Treasury Department to Section 13 of H.R. 10650, p. 2, reprinted in Congressional Hearings before Senate Finance Committee, 87th Cong., 2d Sess., part 11, p. 4418 (1962).) The Treasury's detailed explanation of the changes to the House bill says nothing about the earnings and profits language of the House bill or the dividend limitation provision of the draft bill. *Id.* at pp. 4419–4420. Equally silent as to a change in regard to the earnings and profits issue is the Senate Finance Committee report. See "Comparison of committee amendments with House provision," S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 707, 785–786. The committee's explanation of section 956(a)(1) merely reiterates the language of the dividend limitation provision without comment. S. Rept. No. 1881, *supra*, 1962–3 C.B. at 954. The Conference Committee report also throws no light on the subject. Conf. Rept. No. 2508, 87th Cong., 2d Sess., 1962–3 C.B. 1157–1164.

Petitioners argue that neither the Treasury nor the Senate intended to change the meaning of the House bill so as to adopt the interpretation urged by respondent in this case. It is inconceivable, they say, that section 951(a)(1)(B) could have been intended to apply to pre-1963 accumulated earnings without a word of comment to that effect in the Treasury's explanation of its proposals or the Senate and Conference committee reports.

We are not persuaded by this argument. Certainly such an *argumentum ex silentio* is insufficient to overturn what we think is a reasonable construction of section 956(a)(1). Nor do we think, despite the silence of the committee reports, that Congress was unaware of the change made by the substitution of the dividend limitation provision of the Senate bill for the explicit language of H.R. 10650, exempting pre-1963 earnings and profits. To the contrary, the fact that the Treasury proposals and the Senate bill as reported by the Senate Finance Committee applied to investments of pre-1963 earnings in U.S. property was brought to the attention of the Senate Finance Committee and pointed out during the course of the Senate debate on the bill. See Hearings before Senate Finance Committee on the Revenue Act of 1962, p. 4765 (1962); 108 Cong. Rec. 18233 (1962).[15] While statements

---

[15] Senator Miller made the following statement:

"The section [956] would tax an increase in investment in U.S. property even though attributable to earnings and profits accumulated before January 1, 1963. This represents a marked change from the parallel provisions of section 953 of the House bill, which limited the tax to earnings and profits accumulated after December 31, 1962. In this important respect it seems clear that section 956 is not 'with technical changes, substantially the same' as the parallel provisions of the House bill."

made in congressional debates and hearings are not always reliable guides to legislative intent, they have on occasion been regarded as some indication that Congress was aware of possible consequences that would arise from the proposed legislation. See *O'Hara* v. *Luckenbach Steamship Co.*, 269 U.S. 364, 367–368 (1926); *Penn Mutual Co.* v. *Lederer*, 252 U.S. 523, 534 (1920). Consequently, even if we were to conclude that the language of section 956(a)(1) is ambiguous (see p. 927 *infra*), we would reject the argument that Congress could not have intended the meaning which respondent ascribes to sections 951(a)(1)(B) and 956(a)(1).

Petitioners seek solace from other provisions of the Revenue Act of 1962, which they claim evidence a legislative intent to exempt pre-1963 earnings and profits from the computation of amounts invested in U.S. property. First, they point to the effective date provision contained in section 12(c) of the Revenue Act of 1962 (see fn. 13 *supra*). That provision, however, does not purport to alter the meaning of the terms used in the statute but only specifies the first taxable year of the statute's operation. The requisite taxable event which activates section 951(a)(1)(B), and therefore section 956(a)(1), is not an increase in the controlled foreign corporation's earnings but rather an increase in its investment in U.S. property.

Petitioners also attempt to support their contention by reference to certain related statutory provisions which are limited in application, by their own terms, to earnings and profits of the controlled foreign corporation accumulated after December 31, 1962. The principal sections involved are section 956(b)(2)(F), relating to certain earnings and profits arising out of post-1962 income derived from sources within the United States, and sections 1246 and 1248, which limit dividend treatment to that portion of the gain on the sale or exchange of stock of certain foreign corporations attributable to post-1962 accumulated earnings and profits and accord capital gain treatment to the balance, including such portion as might be represented by pre-1963 accumulated earnings and profits. But these sections are concerned with whether or not the foreign corporation, and not its shareholders, has been subject to U.S. tax on its income. Section 951(a)(1)(B), on the other hand, has the stated objective of treating a controlled foreign corporation's increase in earnings invested in U.S. property as if it were a dividend paid to the corporation's shareholders. Earnings of the controlled foreign corporation repatriated to the United States are regarded as being the equivalent of a dividend paid to the U.S. shareholders. See H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 462; S. Rept. No. 1881, *supra*, 1962–3 C.B. at 794. Unlike sections 956(b)(2)(F), 1246, and 1248, the focus of section 951(a)(1)(B) is not whether the foreign corporation has been

avoiding tax on its income, but whether the shareholder should be considered as having received something akin to a constructive dividend. See also pp. 929–930 *infra*. We do not think the different provisions have the same purpose and therefore do not perceive any necessary inconsistency between them.

Finally, petitioners urge that we exempt pre-1963 earnings and profits from the operation of section 951(a)(1)(B) in order to effectuate what they contend to be the overall legislative purpose of subpart F, namely, to discourage the accumulation of funds abroad by U.S. taxpayers. As we have had occasion to point out previously, the search for a unified legislative purpose in subpart F proves to be elusive. See *Estate of Leonard E. Whitlock*, 59 T.C. 490, 501 (1972), on appeal (C.A. 10, May 25, 1973 (respondent) and June 4, 1973 (petitioner)). Concededly, respondent's application of section 951(a)(1)(B) may tend to have a counterproductive effect in that it may discourage the repatriation of funds accumulated abroad by controlled foreign corporations. But the same can be said of post-1962 earnings of controlled foreign corporations to the extent that they are not currently taxable to U.S. shareholders. Under all the circumstances, given the multiplicity of legislative purposes which underlay the enactment of subpart F, we cannot say that the statutory language is so lacking in clarity that we should undertake the task of rewriting it. Compare *Hanover Bank* v. *Commissioner*, 369 U.S. 672, 687 (1962). Clearly, such multiplicity and the legislative history, meager as it is, preclude us from finding that Congress has legislated eccentrically. See *J. C. Penney Co.* v. *Commissioner*, 312 F. 2d 65, 68 (C.A. 2, 1962), affirming 37 T.C. 1013.

Accordingly, we sustain respondent's position as to the interpretation of sections 951(a)(1)(B) and 956(a)(1), thereby resolving the question which we did not reach in *Estate of Leonard E. Whitlock*, 59 T.C. at 505.

### 2. *Constitutionality of Section 951(a)(1)(B)*

Petitioners next attack respondent's position in this case on constitutional grounds. They argue that subpart F is constitutionally deficient in its basic concept—taxing shareholders on the undistributed earnings of their corporation—and, furthermore, in its application to their particular situation, where all of the corporation's earnings were accumulated prior to the effective date of the statute.

Subpart F has withstood constitutional challenges on two previous occasions. In *Garlock Inc.*, 58 T.C. 423, 438 (1972), on appeal (C.A. 2, Aug. 31, 1972), this Court upheld the constitutionality of section 951 (a)(1)(A) in taxing the U.S. shareholder of a controlled foreign cor-

poration on his pro rata share of the corporation's subpart F income. We later held, in *Estate of Leonard E. Whitlock*, 59 T.C. at 505–510, that there is no constitutional bar to the operation of section 951(a) (1)(B) in taxing a U.S. shareholder on his pro rata share of the corporation's increase in earnings invested in U.S. property for the taxable year, at least in the situation where such increase does not exceed the corporation's earnings and profits of that taxable year.

Petitioners' initial challenge to the overall constitutionality of subpart F must be rejected on the authority of *Garlock* and *Whitlock*. The question remaining is whether section 951(a)(1)(B) may be constitutionally applied in the particular circumstances of this case. Liberia, the controlled foreign corporation, had no current earnings and profits during 1963, the taxable year in issue. All of its earnings and profits were accumulated in years prior to 1963, which was the first year subject to the operation of subpart F. On these facts, petitioners argue that all of Liberia's earnings, having been realized in years prior to 1963, were integrated into Liberia's capital by the time subpart F became effective. Relying on *Eisner v. Macomber*, 252 U.S. 189 (1920), a venerable but often criticized page in the lore of Federal income taxation, petitioners therefore conclude that Liberia had no income, within the meaning of the 16th amendment, which could be taxed to its shareholders under section 951(a)(1)(B).

We pause first to reiterate some of the observations we made in *Estate of Leonard E. Whitlock, supra.* We noted therein that the doctrine of *Eisner v. Macomber, supra,* does not prevent Congress from bypassing the corporate entity in determining the incidence of Federal income taxation. This principle has special application in the case of controlled foreign corporations, which Congress has found to be frequently abused by their U.S. shareholders as vehicles for the avoidance of tax. S. Rept. No. 1881, *supra,* 1962–3 C.B. at 784–785. In subpart F, Congress has singled out a particular class of taxpayers, U.S. shareholders, whose degree of control over their foreign corporation [16] allows them to treat the corporation's undistributed earnings as they see fit. Compare *Corliss v. Bowers*, 281 U.S. 376, 378 (1930), where the Supreme Court said, in connection with the taxability of a grantor on the income of a revocable trust, "The income that is subject to a man's unfettered command and that he is free to enjoy at his own

---

[16] Sec. 957(a) defines a controlled foreign corporation as "any foreign corporation of which more than 50 percent of the total combined voting power of all classes of stock entitled to vote is owned (within the meaning of section 958(a)), or is considered as owned by applying the rules of ownership of section 958(b), by United States shareholders on any day during the taxable year of such foreign corporation." Sec. 958(a) and (b) sets forth rules for determining direct and attributed (indirect and constructive) ownership. Sec. 951(b) defines a "United States shareholder" as a U.S. person owning or considered as owning "10 percent or more of the total combined voting power of all classes of stock entitled to vote of such foreign corporation."

option may be taxed to him as his income, whether he sees fit to enjoy it or not."

The stated objective of section 951(a)(1)(B) is "to prevent the repatriation of income to the United States in a manner which does not subject it to U.S. taxation." H. Rept. No. 1447, *supra*, 1962–3 C.B. at 462. "Generally, earnings brought back to the United States are taxed to the shareholders on the grounds that this is substantially the equivalent of a dividend being paid to them." S. Rept. No. 1881, *supra*, 1962–3 C.B. at 794.

We deal next with the assertion that the application of section 951 (a)(1)(B) involves a retroactive taxation of income which is beyond the power of Congress to legislate, because it operates herein, if at all, to tax earnings and profits of a controlled foreign corporation accumulated before the effective date of subpart F. But the facts are that the taxable event herein—an increase in earnings invested in U.S. property—occurred during a year subject to the operation of the statute and that Congress has power to tax income—here the income of the corporation imputed to its shareholders—by a new statute, although the measure of the income is generated by income of a past year prior to the effective date of the statute. See *Brushaber* v. *Union Pac. R.R.*, 240 U.S. 1, 20 (1916), citing *Stockdale* v. *Insurance Companies*, 87 U.S. (20 Wall.) 323, 331 (1873). See also cases involving the purported retroactivity of taxing statutes, collected and discussed in the dissenting opinion of Mr. Justice Brandeis in *Untermyer* v. *Anderson*, 276 U.S. 440, 447–451 (1928). Compare also *Lynch* v. *Hornby*, 247 U.S. 339 (1918), where the Supreme Court held that there was no constitutional barrier to the taxation of dividends paid out of earnings and profits accumulated prior to March 1, 1913.

In *Whitlock*, the taxable event was the investment of *current* earnings of a controlled foreign corporation. In this case, we take an additional step and hold that there is no constitutional barrier to the operation of section 951(a)(1)(B) in respect of pre-1963 earnings and profits of a controlled foreign corporation, even though they were accumulated prior to the effective date of subpart F. *Eisner* v. *Macomber, supra*, presents no more of a barrier to this conclusion here than it did in *Whitlock*.

In *Eisner* v. *Macomber, supra*, the purported taxable event was the issuance to a shareholder of a piece of paper, i.e., a share of stock representing a part of the same interest which he already held in the corporation. Such being the case, the Supreme Court considered that there was no severance of corporate assets and perceived the asserted tax as one imposed on "property because of ownership" (see 252 U.S. at 217). Consequently, it was held that there was no income within the

930

meaning of the 16th amendment and that what was involved was a direct tax in violation of art. I, sec. 2, cl. 3, and art. I, sec. 9, cl. 4, of the Constitution. That this sameness of stock and proportionate interest was the key to decision is made pellucid by subsequent decisions of the Supreme Court wherein the receipt of a different interest was held to be a taxable event because it in effect represented a constructive separation of corporate assets. See, e.g., *Helvering* v. *Griffiths*, 318 U.S. 371 (1943); *Koshland* v. *Helvering*, 298 U.S. 441 (1936).

Because of the shareholder's control over the corporation, the corporate entity is bypassed for taxation purposes and such income is taxed directly to the shareholder. Sec. 951(a)(1)(A). In the case of section 951(a)(1)(B), Congress has decided that certain income realized by the corporation should not be taxed to the shareholder until something more occurs—the repatriation of that income in the form of an increase in earnings invested in U.S. property. The taxable event in that situation is the investment in U.S. property, occurring in a year subject to the operation of the statute. That is the event which Congress has regarded as manifesting the shareholder's exercise of control over the previous income of the corporation.

Concededly, there has been no separation of corporate assets herein in the sense that the petitioners have directly received something out of Liberia's assets for their separate use and benefit. See *Eisner* v. *Macomber*, 252 U.S. at 211. Indeed, an increase in investment of earnings in U.S. property such as occurred in this case might well be insufficient to justify taxation under the judicially created doctrine of constructive dividends.[17] But such insufficiency does not support the use of *Eisner* v. *Macomber, supra*, to interpose a constitutional barrier to a statutory constructive dividend doctrine which in effect is what is involved herein, at least where the application of that doctrine is limited to controlled foreign corporations and U.S. shareholders whose degree of control over such corporations meets the requirements of section 957(a) and 957(b).[18] See fn. 16 *supra*. In reaching this conclusion, we have accorded due weight to the plenary power to tax conferred upon Congress by art. I, sec. 8, cl. 1, of the Constitution and the presumption in favor of legislation enacted by that body. See *Penn Mutual Indemnity Co.*, 32 T.C. 653 (1959), aff'd. 277 F. 2d 16 (C.A. 3, 1960).

We hold for respondent on the constitutional issue.

---

[17] See cases collected in *Joseph Lupowitz Sons, Inc.*, T.C. Memo. 1972–238.

[18] We note further that throughout the taxable period in question petitioner was the sole shareholder of Liberia (the controlled foreign corporation) and was the sole shareholder of Indiana, sole owner of Company, and directly and constructively the owner of 70 percent of the stock of IBOA (the recipients of the funds representing the increase in earnings invested in U.S. property).

### 3. *Taxable Year of the Corporation*

Petitioners put forward one other contention which, they hope, will relieve them from the operation of section 951(a) (1) (B) in this case. That section provides that a U.S. shareholder of a controlled foreign corporation—

shall include in his gross income, *for his taxable year in which or with which such taxable year of the corporation ends*—

\*        \*        \*        \*        \*        \*        \*

his pro rata share \* \* \* of the corporation's increases in earnings invested in United States property *for such year* \* \* \*
　[Emphasis added.]

Petitioners maintain that Liberia's "taxable year" for purposes of subpart F was the fiscal year ending August 31 and that, under the effective date provision (see fn. 13 *supra*), Liberia's first taxable year subject to the operation of subpart F would then be its fiscal year beginning September 1, 1963, and ending August 31, 1964. Hence petitioners contend that their first taxable year subject to the operation of subpart F would be 1964, a year not before the Court.

In order to determine Liberia's taxable year, we look to the definition of that term found in section 441. The definition of the term "taxable year" found in section 441(b) is expressly made applicable to subtitle A, which includes subpart F. We reject petitioners' argument that a foreign corporation which has no income subject to U.S. tax cannot have a taxable year. Compare secs. 551 through 558; *Forrest City Production Credit Assn.* v. *United States*, 300 F. Supp. 609 (E.D. Ark. 1969), affirmed per curiam 426 F. 2d 819 (C.A. 8, 1970). See also Rev. Proc. 63-7, fn. 22 *infra*. Insofar as the taxable year issue in this case is concerned, Liberia is subject to the provisions of section 441 and the regulations thereunder.

Section 441 is set forth below in pertinent part:

SEC. 441. PERIOD FOR COMPUTATION OF TAXABLE INCOME

(b) TAXABLE YEAR.—For purposes of this subtitle, the term "taxable year" means—
　　(1) the taxpayer's annual accounting period, if it is a calendar year or a fiscal year;
　　(2) the calendar year, if subsection (g) applies; \* \* \*

\*        \*        \*        \*        \*        \*        \*

(c) ANNUAL ACCOUNTING PERIOD.—For purposes of this subtitle, the term "annual accounting period" means the annual period on the basis of which the taxpayer regularly computes his income in keeping his books.

\*        \*        \*        \*        \*        \*        \*

(g) NO BOOKS KEPT; NO ACCOUNTING PERIOD.—\* \* \* the taxpayer's taxable year shall be the calendar year if—
　　(1) the taxpayer keeps no books;
　　(2) the taxpayer does not have an annual accounting period \* \* \*

Respondent contends that Liberia's taxable year was the calendar year because it had no annual accounting period, as that term is defined in section 441(c), and would therefore have the calendar year as its taxable year under section 441(b)(2) and (g)(2). Alternatively, respondent contends that Liberia's annual accounting period was in fact the calendar year.

A taxpayer's annual accounting period is determined by examining all the facts relative to such corporation's method of accounting. *Great West Printing Co.* v. *Commissioner*, 60 F. 2d 749 (C.A. 8, 1932), affirming 22 B.T.A. 346 (1931).

Petitioner testified that he directed his accountants to maintain the books and records of Liberia on the basis of a fiscal year ending August 31. The reason for adopting such a fiscal year, according to petitioner, was to have Liberia's accounts reflect a full first year of business. According to petitioner, the particular fiscal years of Indiana and IBOA were adopted for the same reason. Petitioners insist that this testimony regarding Liberia's accounting period is credible, consistent, and uncontradicted and should therefore be accepted as conclusive. We are not persuaded by such testimony, however, because the preponderance of the evidence tends to indicate that Liberia used the calendar year as its annual accounting period.

The fact is that none of the documentary evidence (with the exception of the election hereinafter referred to, see p. 933–934 *infra*) indicate that Liberia had any accounting period other than a calendar year. This includes balance sheets, income and expense statements, ledger accounts,[19] and various information returns filed with the Internal Revenue Service.[20] Although petitioners attempt to explain away these indicia, their explanations fail to counteract the considerable doubt which the documentary evidence casts upon petitioner's testimony. Under such circumstances, we are not required to accept

---

[19] The record contains the following records relating to Liberia: Balance sheets as of Dec. 31, 1962, 1963, and 1964; income and expense statements for the period Sept. 12, 1956, through Dec. 31, 1962, and for the year ended Dec. 31, 1964; and Liberia's ledger sheets representing the contra accounts between it and Indiana, IBOA, and Company, all showing annual demarcations running from Jan. 1 to Dec. 31 of each year.

[20] Submitted in evidence were the following returns relating to Liberia:

(1) a Form 957 (Rev. March 1964), United States Information Return by an Officer, Director, or U.S. Shareholder with Respect to a Foreign Personal Holding Company, "For the year beginning January 1, 1965 and ending October 26, 1965." [Underscoring indicates blanks on the form that had been filled in.]

(2) a Form 958, U.S. Annual Information Return by an Officer or Director with Respect to a Foreign Personal Holding Company, "For Calendar Year 1965 or other taxable year beginning January 1, 1965 and ending October 26, 1965."

(3) a Form 2952 (Rev. Dec. 1963), Information Return with Respect to Controlled Foreign Corporations, "For Calendar Year 1964", "Information furnished for period beginning Jan. 1, 1964 and ending Dec. 31, 1964."

We note that sec. 6035(a) requires the information in Forms 957 and 958 to be returned in respect to the "taxable year" of the foreign corporation, and sec. 6038(a)(2) requires the information in Form 2952 to be furnished "for the annual accounting period of the foreign corporation."

petitioner's testimony as gospel. See, e.g., *Fleischer* v. *Commissioner*, 403 F. 2d 403, 406 (C.A. 2, 1968), affirming a Memorandum Opinion of this Court; *National Fireworks* v. *Commissioner*, 243 F. 2d 295, 297 (C.A. 1, 1957); *Archer* v. *Commissioner*, 227 F. 2d 270, 273 (C.A. 5, 1955). If in fact Liberia actually used a fiscal year, it would seem that some independent evidence which would have so indicated could have been produced.[21] Cf. *Wichita Terminal Elevator Co.*, 6 T.C. 1158, 1165 (1946), affd. 162 F. 2d 513 (C.A. 10, 1947). Moreover, we find the evidence in the record, regarding the need in the mind of petitioner to have Liberia's loans to IBOA made due and payable and actually repaid before December 31, 1963 (see p. 919 *supra*), a strong indication that Liberia had a calendar year accounting period. If Liberia had used an annual accounting period ending August 31, the December 31, 1963, date would have had no importance in the context of this case. On the basis of the record before us, we hold that Liberia used the calendar year as its annual accounting period. *Georges Simenon*, 44 T.C. 820, 832 (1965).

In the alternative, petitioners argue that Liberia adopted the fiscal year ending August 31 as its taxable year in accordance with the provisions of Rev. Proc. 63–7, 1963–1 C.B. 485, 486 (Rule 3).[22] On

---

[21] We note that the accountant for the Dougherty enterprises, who was called to testify by petitioners, was not asked whether Liberia ever adopted an Aug. 31 fiscal year.

[22] Rev. Proc. 63–7. Changes in accounting periods and in methods of accounting.

Rules for determining the taxable year of a foreign corporation for purposes of section 902(d), sections 951 through 972, and sections 1246 through 1248 of the Internal Revenue Code of 1954, as amended or added by the Revenue Act of 1962.

The purpose of this Revenue Procedure is to set forth rules for determining the taxable year of a foreign corporation for purposes of section 902(d), sections 951 through 972, and sections 1246 through 1248 of the Internal Revenue Code of 1954, as amended or added by the Revenue Act of 1962. The rules to be followed for such purposes are as follows:

Rule 1. The taxable year of the foreign corporation shall be determined under section 441 of the Code, and the regulations thereunder, and by treating a foreign corporation which is not subject to United States income tax as though it were a taxpayer within the meaning of section 7701(a)(14) of the Code.

\*          \*          \*          \*          \*          \*          \*

Rule 3. A foreign corporation may adopt a taxable year beginning in 1962 as though such foreign corporation were a new taxpayer within the meaning of paragraph (b)(3) of section 1.441–1 of the Income Tax Regulations, but only if the following conditions are satisfied:

\*          \*          \*          \*          \*          \*          \*

(e) The foreign corporation adopts an annual accounting period which ends on or before December 31, 1962, and the adoption is effected not later than the 15th day of the third month following the close of such annual accounting period; and

(f) One or more of the United States shareholders (as defined in section 951(b) of the Code) of the foreign corporation give written notice of, and file a statement (certified under penalties of perjury) of an officer of such foreign corporation who is a citizen or resident of the United States, or, if there is no such officer, of any officer of such foreign corporation, attesting to, the timely adoption under this rule of such annual accounting period. The notice and statement so required of a United States shareholder shall be filed within the time prescribed by law (not including extensions) for the filing of his income tax return for the taxable year with or within which such newly adopted annual accounting period of the foreign corporation ends and shall be filed with the district director of internal revenue for the district in which such income tax return is required to be filed.

April 29, 1968, petitioner, as the sole shareholder and president of Liberia, filed with the district director of internal revenue at Chicago a statement entitled "Election of Sole Shareholder of Dougherty Overseas, Inc., a Liberian Corporation As To Annual Accounting Period Pursuant to Revenue Procedure 63–7," stating that he "elects a fiscal year ending August 31, beginning with the year 1962 for Dougherty Overseas [Liberia]." Respondent denied petitioner's "election" under Rev. Proc. 63–7 solely on the ground that it was not filed with petitioner's tax return for the year 1962 or, in respondent's opinion, within a reasonable time thereafter. See fn. 23 *infra*.

There is a fatal flaw in petitioners' position. We have found as a fact that Liberia maintained a calendar year accounting period throughout the entire period of its existence. That finding, as we have previously pointed out, is based upon the failure of the record before us to disclose that Liberia maintained its books and records on any basis other than the calendar year. Liberia and petitioner were separate entities and petitioner's "election" cannot be deemed an adoption of an August 31 fiscal year by Liberia. *Max Freudmann*, 10 T.C. 775, 791–794 (1948). Cf. *Gill* v. *United States*, 258 F. 2d 553 (C.A. 5, 1958); *Atlas Oil & Refining Corporation*, 17 T.C. 733 (1951); *Irene Nunnery Theriot*, 15 T.C. 912 (1950), affd. 197 F. 2d 13 (C.A. 5, 1952). Compare also *Linen Thread Co., Ltd.*, 14 T.C. 725 (1950). Under these circumstances, the provisions of Rev. Proc. 63–7, *supra*, simply never came into play and we need not explore the question whether Liberia could have validly adopted a change in its accounting period more than 2 years after it was liquidated. Nor need we deal with the issue of whether, if Liberia had adopted an August 31 fiscal year, petitioner's "election" would have been timely.[23] Compare discussion in respect of the section 962 election, pp. 938–942 *infra*.

### 4. *Increase in Earnings Invested in United States Property*

Our next task is to determine the amount of Liberia's increase in earnings invested in U.S. property for 1963. In connection with this determination, petitioners argue that IBOA's notes payable to Liberia did not constitute "United States property" as that term is defined in section 956(b) and the regulations promulgated thereunder.

Section 956(b)(1)(C) states that U.S. property includes "any property acquired after December 31, 1962 which is  *  *  * an obligation

---

[23] In view of the fact that the record establishes that Liberia did not adopt an Aug. 31 fiscal year, we do not consider that we are precluded from holding that petitioner did not make a proper election by virtue of the stipulation of the parties that the election was denied "solely for the reason that it was not filed with petitioners' tax return for the year 1962 or within a reasonable time thereafter." See, e.g., *Adolph Weinberg*, 44 T.C. 233, 243 (1965), affirmed on this point sub nom. *Commissioner* v. *Sugar Daddy, Inc.*, 386 F. 2d 836 (C.A. 9, 1967).

of a United States person." Section 1.956–2(d)(2), Income Tax Regs., further provides that the term "obligation," as used in section 956(b)(1)(C), includes—

any bond, note, debenture, certificate, bill receivable, account receivable, note receivable, open account, or other indebtedness, whether or not issued at a discount and whether or not bearing interest, except that such term shall not include—

\* \* \* \* \* \* \*

(ii) Any indebtedness \* \* \* which—

(a) Is collected within one year from the time it is incurred, or

(b) Matures within one year from the time it is incurred but is not collected within such period solely by reason of the inability or unwillingness of the debtor to make payment within such period. .

For purposes of (b) of this subdivision, a failure to collect an indebtedness within the one-year period will not be attributed to inability or unwillingness on the part of the debtor to make payment unless it is clearly established that the creditor has made reasonable efforts to collect such indebtedness within such period. \* \* \*

Each of IBOA's notes payable to Liberia, given in return for Liberia's loans to IBOA, matured no later than December 31, 1963, that is, within 1 year from the time each was incurred (hereinafter referred to as the requisite period).

Petitioners contend that the notes fit within the exception stated in section 1.956–2(d)(2)(ii)(b)[24] because they were not collected within the requisite period solely by reason of the inability of IBOA to make payment within such period, since Liberia made reasonable efforts to collect on the notes within the requisite period.

Respondent disagrees, asserting that the failure to collect the notes within such period was not solely by reason of IBOA's inability to make payment, since it has not been established that Liberia made reasonable efforts to collect on the notes within such period.

It is apparent from IBOA's balance sheet as of December 31, 1963, that it was in no position to repay Liberia's loans at that time without first selling the Lynn lease, and the record indicates that the same situation obtained during that part of 1964 subsequent to July 15, 1964, which latter date was 1 year from the time when Liberia made its last loan to IBOA.[25]

---

[24] Sec. 1.956–2, Income Tax Regs., was adopted in its present form on Feb. 20, 1964. T.D. 6704, 1964–1 C.B. 284, 290–296. As first proposed on Apr. 11, 1963, the regulation would have included within the term "obligation" indebtedness like that involved herein except where the creditor "unreasonably delays the prompt collection of such indebtedness." Proposed Regulation 1.956–2(d)(2), 28 Fed. Reg. 3541, 3551. Petitioners take the position that the proposed regulation, rather than the regulation in its present form, should be applied in this case. We need not resolve this question, however, because our decision would be the same under either the proposed or final regulation.

[25] Respondent has not argued that IBOA should be considered as having been able to repay some part of its indebtedness to Liberia within the requisite period and we, therefore, will not consider the possibility of fragmentation. Compare *Alfonso Diaz,* 58 T.C. 560, 565 fn. 2 (1972).

Once it was ascertained in July of 1963 that the Lynn lease was not sufficiently productive to enable repayment of those loans by the end of the year, serious efforts were made to obtain a buyer of the lease.[26] These efforts bore fruit in 1964.

On occasion, a prudent creditor will forebear from demanding immediate repayment of a loan at its maturity when the debtor has suffered unexpected financial setbacks and full repayment is expected to be more practicable at a later time. See *Bordo Products Co.* v. *United States*, 201 Ct. Cl. 482, 476 F. 2d 1312 (1973). We think that petitioner was justified in treating Liberia's loans to IBOA in such a manner. Under the circumstances, we agree with petitioners that Liberia made reasonable efforts to collect IBOA's indebtedness to it within the requisite period. We conclude that IBOA's notes to Liberia fit within the "inability of the debtor" exception stated in section 1.956–2(d)(2)(ii) (*b*), are thereby excluded from the category of "United States property," and may be disregarded in determining Liberia's increase in earnings invested in U.S. property for 1963.[27]

In view of our conclusion, it is unnecessary for us to examine the question of whether the $5,800 payment by IBOA for the account of Liberia on October 15, 1963, should be applied against the $62,000 balance as of December 31, 1962, or to the loans by Liberia to IBOA during 1963.[28] Moreover, the record herein clearly indicates that such payment was to be applied against the indebtedness of IBOA to Liberia, so that no basis exists, as petitioners contend, for taking it into account in computing Liberia's increase in earnings vis-a-vis loans to Indiana or Company. See pp. 937–938 *infra*.

Our conclusion in regard to the indebtedness of IBOA dispenses with the bulk of what respondent determined to be Liberia's increase in earnings invested in U.S. property for 1963. It does not dispose of the entire case, however, because respondent still contends that there was an increase in Liberia's investment in Indiana and Company for 1963. Petitioners do not dispute that the indebtedness of Indiana and Company to Liberia constituted U.S. property but contend that there was no increase for the year. They stress the fact that the aggregate total indebtedness of Indiana and Company to Liberia at the

---

[26] We note, in this connection, the futility of trying to distinguish between the efforts of IBOA and those of Liberia, considering the fact that petitioner controlled and actively managed the affairs of both corporations.

[27] We intimate no opinion as to whether an indebtedness that meets the "inability of the debtor" exception at the close of 1 taxable year might not, as a result of remaining unpaid beyond the requisite period, emerge from the shelter of that exception during the succeeding taxable year to become U.S. property. Cf. *Clayton E. Greenfield*, 60 T.C. 425 (1973), which suggests such a possibility in connection with the exception under sec. 956(b)(2)(C).

[28] In this connection, we note that the aforementioned $62,000 balance would, in any event, be entirely excludable from the computation of Liberia's increase in investment in U.S. property during 1963. See *Clayton E. Greenfield, supra*, fn. 27.

close of 1962 ($278,214.79) exceeded such total at the close of 1963 ($126,960.45), due to Company's substantial repayments to Liberia during 1963.

If we look at the situation as petitioners do, we do seem to be faced with the conundrum of an alleged increase that looks suspiciously like a decrease. We think, however, that petitioners misconceive the situation, and that the source of their misconception lies in the definition of "United States property."

The formula for determining a controlled foreign corporation's increase in earnings invested in U.S. property for a particular year is found in section 956(a). The first step in applying the formula is to determine the aggregate amount of U.S. property held by Liberia at the close of the taxable year (1963) and the preceding taxable year (1962). On December 31, 1962, Indiana and Company were indebted to Liberia in the respective amounts of $74,495.22 and $203,719.57. By definition, however, the amount of Liberia's investment in U.S. property at that time was zero, since "United States property" means only property acquired after December 31, 1962. See sec. 956(b)(1); *Clayton E. Greenfield, supra.* Such being the case, repayments applicable to such indebtedness do not reduce the amount of U.S. property held by Liberia.

On December 31, 1963, Indiana owed Liberia $91,646.38. Of that amount $17,151.16 was incurred during 1963 and not repaid within 1 year. The rest was indebtedness incurred prior to 1963 and therefore is not counted. On December 31, 1963, Company owed Liberia $35,-314.07. All of that amount was indebtedness incurred during 1963 but $1,263.31 was repaid within 1 year and is therefore excluded from the category of U.S. property under the "collection within one year" exception of section 1.956–2(d)(2)(ii)(a). The aggregate amount of U.S. property held by Liberia at the close of 1963 was thus $51,201.92— $17,151.16 indebtedness of Indiana and $34,050.76 indebtedness of Company.

The final step in the formula is subtracting the aggregate amount of U.S. property held by Liberia at the close of 1962 (zero) from such amount at the close of 1963 ($51,201.92). Accordingly, Liberia's increase in earnings invested in U.S. property for 1963 was $51,201.92. With further reference to petitioners' contention, we note that Company's indebtedness to Liberia on December 31, 1962 ($203,719.57), was fully repaid on April 8, 1963, *before* any advances by Liberia to Company during 1963 were made. Under these circumstances, we find no basis for holding, as petitioners would have us do, that the repayments to Liberia by Company should be applied against the amount subsequently advanced and the "excess" of such repayments should

be applied against advances by Liberia to either Indiana or IBOA.[29] Section 951(a) (1) (B) has the stated objective of treating a controlled foreign corporation's increased investment in U.S. property as tantamount to a dividend distributed to the U.S. shareholders of the corporation. See p. 926, *supra.* Liberia made additional loans to Indiana and Company during 1963. The fact that Company made repayments to Liberia during 1963 on account of indebtedness incurred before the effective date of the statute does not detract from the fact such additional loans were made.

### 5. *The Election under Section 962*

The final issue is whether petitioner has made an effective election under section 962 [30] in respect to his taxable year 1963. That section provides an election for an individual U.S. shareholder to be subject to tax at corporate rates instead of individual rates with respect to amounts included in his gross income under section 951(a).[31]

Petitioners' income tax return for 1963, which was timely filed, contained no reference to Liberia or to any amount includable in their gross income under section 951(a). On April 15, 1968, petitioner first notified the respondent of his election, in the event any amount was includable in his gross income for 1963 under section 951(a), to be taxed on such amount at corporate rates, as provided in section 962. This election was made in response to the respondent's indication at that time of his intention to include in petitioners' gross income for 1963 an

---

[29] We express no opinion as to what our view might be in a situation where repayments were less clearly identifiable with specific obligations of the repaying debtor. Compare *Clayton E. Greenfield,* 60 T.C. at 433 fn. 16 .

[30] SEC. 962. ELECTION BY INDIVIDUALS TO BE SUBJECT TO TAX AT CORPORATE RATES.

(a) GENERAL RULE.—Under regulations prescribed by the Secretary or his delegate, in the case of a United States shareholder who is an individual and who elects to have the provisions of this section apply for the taxable year—

(1) the tax imposed under this chapter on amounts which are included in his gross income under section 951(a) shall (in lieu of the tax determined under section 1) be an amount equal to the tax which would be imposed under section 11 if such amounts were received by a domestic corporation * * *

\* \* \* \* \* \* \*

(b) ELECTION.—An election to have the provisions of this section apply for any taxable year shall be made by a United States shareholder at such time and in such manner as the Secretary or his delegate shall prescribe by regulations. An election made for any taxable year may not be revoked except with the consent of the Secretary or his delegate.

[31] For an introduction to sec. 962, see Boffa, "Section 962 : Relief for U.S. Shareholders ; How to Make Election, Its Effects, When to Use It," 39 J. Taxation 48 (July 1973). In its explanation of subpart F, the Senate Finance Committee stated :

"The purpose of this provision [sec. 962] is to avoid what might otherwise be a hardship in taxing a U.S. individual at high bracket rates with respect to earnings in a foreign corporation which he does not receive. This provision gives such individuals assurance that their tax burdens, with respect to these undistributed foreign earnings, will be no heavier than they would have been had they invested in an American corporation doing business abroad." [S. Rept. No. 1881, *supra,* 1962–3 C.B. at 798.]

amount under section 951(a)(1)(B) by reason of an increase in Liberia's earnings invested in U.S. property for such year.

Section 962(b) provides that an election under that section "shall be made by a United States shareholder at such time and in such manner as the Secretary or his delegate shall prescribe by regulations." Petitioner has obviously failed to make such an election within the time prescribed by either the temporary regulations [32] or final regulations.[33]

---

[32] Temporary regulations relating to the election under sec. 962 were first published on Jan. 31, 1964. T.D. 6703, 1964–1 C.B. (Part 1) 614. In pertinent part, they provided:

Sec. 16.5–1 ELECTION BY UNITED STATES SHAREHOLDERS OF CONTROLLED FOREIGN CORPORATIONS TO BE SUBJECT TO TAX AT CORPORATE RATES.—

(a) *Election after publication of regulations.*—An individual who is a United States shareholder of a controlled foreign corporation may elect as provided in paragraph (b) of this section to have section 962 apply for a taxable year or, in lieu of making the election under such paragraph, may elect for such year under the regulations to be issued under section 962. Such regulations will provide a reasonable period of time within which an individual who is a United States shareholder of a controlled foreign corporation will be permitted to elect to have section 962 apply for a taxable year which ends after December 31, 1962, and before the date on which such regulations are published in the Federal Register. If an election is made for any taxable year under paragraph (b) of this section, it must be made with respect to all controlled foreign corporations with respect to which the individual includes an amount in gross income for such year under section 951(a).

(b) *Manner of making election under temporary regulations.*—(1) *Filing of statement and schedule.*—An individual who is a United States shareholder of a controlled foreign corporation may elect under this paragraph to have section 962 apply for a taxable year. Such election shall be made by filing with the shareholder's return for the taxable year a statement that such election is made for the taxable year and by attaching to such return a schedule on which is shown the computation of the tax on all amounts included in his gross income under section 951(a) for the taxable year. The amount of tax as so computed shall be included in the amount of total tax shown on the face of the return.

(2) *Information to be provided.*—The following information shall be submitted with the statement of election filed with the United States shareholder's return pursuant to subparagraph (1) of this paragraph:

(i) All amounts which are included in the shareholder's gross income for his taxable year under section 951(a);

(ii) The shareholder's pro rata share of the earnings and profits for the taxable year of all controlled foreign corporations with respect to which such shareholder includes any amount in gross income for his taxable year under section 951(a);

[33] Final regulations under sec. 962 were first published on Oct. 28, 1965. T.D. 6858, 30 Fed. Reg. 13694 (1965). In pertinent part, they provide:

Sec. 1.962–2 Election of limitation of tax for individuals.

(b) *Time and manner of making election.* Except as provided in § 1.962–4, a United States shareholder shall make an election under this section by filing a statement to such effect with his return for the taxable year with respect to which the election is made. * * *

*          *          *          *          *          *          *

Sec. 1.962–4 Transitional rules for certain taxable years.

(a) *Extension of time for making or revoking election.* Paragraphs (b) and (c) of this section provide additional rules with respect to making or revoking an election under section 962 which apply only to a taxable year of a United States shareholder for which the last day prescribed by law for filing his return (including any extensions of time under section 6081) occurs or occurred on or before January 31, 1966.

(b) *Manner of making election not previously made.* If a United States shareholder who has not previously made an election under section 962 for any taxable year referred to in paragraph (a) of this section desires to make such an election, he may do so by filing his return or an amended return for such taxable year together with a statement setting forth the information required under paragraph (b) of § 1.962–2. Such return or amended return and statement shall be filed on or before January 31, 1966.

Petitioners contend, however, that the election made on April 15, 1968, should be regarded as timely because it was made as soon as it became apparent to them that any amount might be includable in their gross income for 1963 under section 951(a)(1)(B). To have made an election earlier, they argue, would make as much sense as holding an election for an officeholder before the office is ever created.

The problem of whether a taxpayer has made a timely and proper election under the Internal Revenue Code has been a constant source of difficulty and has produced a long line of decisions not always consistent in result or rationale. See *Estate of George Stamos*, 55 T.C. 468 (1970); *National Western Life Insurance Co.*, 54 T.C. 33 (1970). The problem is further complicated herein by the fact that the statutory provision and the regulations authorized thereunder provide a specific method by which the election is to be delineated. Cf., e.g., *Columbia Gas System, Inc.* v. *United States*, 473 F. 2d 1244 (C.A. 2, 1973); *Posey* v. *United States*, 449 F. 2d 228 (C.A. 5, 1971); *Peter Mamula*, 41 T.C. 572 (1964), revd. 346 F. 2d 1016 (C.A. 9, 1965).

We distill from the decided cases that the critical question involved in determining the timeliness of a delayed election is whether "the original action (or the failure to act) on the part of the taxpayer did not amount to an election against, and was not inconsistent with, the position which the taxpayer ultimately did adopt." See *National Western Life Insurance Co.*, 54 T.C. at 38. Certainly, nothing done by the petitioner prior to his election in April of 1968 amounted to a disclaimer of the benefits of section 962 or was inconsistent with his later attempt to elect the benefits of that section. Instead, petitioner believed in good faith throughout the period in question that no amount was includable in his gross income for 1963 under section 951(a). He notified the respondent of his election under section 962 as soon as it appeared to him that any amount might be so includable.

It is also significant to note that the instant case does not involve the kinds of difficulties inherent in other situations, where the granting of a right of late election permits the taxpayer in effect to play both ends against the middle as the result of hindsight. See *Riley Co.* v. *Commissioner*, 311 U.S. 55, 58–59 (1940); *Denman Tire & Rubber Co.* v. *Commissioner*, 192 F. 2d 261, 264–265 (C.A. 6, 1951); *Estate of George Stamos*, 55 T.C. at 473, 477. Here, no adjustment which can affect the petitioners' tax liability for another year is involved; the only import of the election appears to be the rate of tax to which petitioners will be subject on the amount included in their income for 1963 under section 951(a)(1)(B). Cf. *W. K. Buckley, Inc.* v. *Commissioner*, 158 F. 2d 158 (C.A. 2, 1946), reversing 5 T.C. 787 (1945); *Gentsch* v. *Goodyear Tire & Rubber Co.*, 151 F. 2d 997 (C.A. 6, 1945); see *Denman Tire & Rubber Co.*, 14 T.C. 706, 716 (1950),

affd. 192 F. 2d 261 (C.A. 6, 1951). In *Buckley* and *Goodyear*, the taxpayer had taken a deduction for foreign taxes on the assumption that it had no tax liability for the years in question and had then sought to take a credit for such taxes when it was later determined, at a point of time subsequent to the due date of its return, that it did in fact have such liability. The Courts of Appeals in those cases allowed such credit even though the statute involved (section 131 of the Internal Revenue Code of 1939) required the taxpayer to signify his desire for such credit "in his return." [34] They considered it "sufficient for the taxpayer to indicate its election when it appears that a tax is due and when, therefore, an election first has significance." See *W. K. Buckley, Inc. v. Commissioner*, 158 F. 2d at 161. We think the same rationale is applicable herein.

Respondent makes no claim that he was in any way hindered by the lack of disclosure on petitioners' return for 1963. Compare *Silver Queen Motel*, 55 T.C. 1101, 1106 (1971). He apparently obtained the necessary information—more, in fact, than is required to be disclosed in a statement regarding the election (see sec. 1.962–2(b), Income Tax Regs.)—as a result of the information return that petitioner filed under section 6038(a).[35] Furthermore, respondent does not contend that recognition of petitioner's delayed election under section 962 in the circumstances of this case will result in petitioner's obtaining any unwarranted advantages by reason of the greater range of hindsight which a late election permits.

In the light of the foregoing, although the issue is not entirely free from doubt, we do not think that petitioner should have been expected to file a protective election with his 1963 return, to be applicable in the event that any amount was ultimately determined to be includable in his gross income for that year under section 951(a)(1)(B). Indeed, respondent's regulations under section 962 (see fn. 33 *supra*) do not indicate any such requirement. They speak only of amounts which are "included" rather than amounts "includable." Such being the case, and considering the stated purpose of section 962 (see fn. 32 *supra*), we think it in order to construe such regulations as permitting a timely election after the return is filed under the circumstances existing herein. Cf. *John P. Reaver*, 42 T.C. 72, 80–81 (1964). We do not believe that the transitional rules contained in section 1.962–4, Income Tax Regs. (see fn. 33 *supra*), require a different conclusion; they are to be interpreted in light of the other provisions of the regulations.[36] Thus,

---

[34] In *Denman Tire & Rubber Co.*, 14 T.C. 706 (1950), this Court appears to have accepted the Court of Appeals' decision in *Buckley* on the basis of the single-year-impact rationale. See 14 T.C. at 716.

[35] Although petitioner filed no information return under sec. 6038(a) with respect to Liberia's 1963 annual accounting period (see sec. 6038(a)(3)), he filed such a return for 1964. See fn. 20 *supra*.

[36] We note that these regulations also use the word "included" instead of "includable."

neither the statute nor the regulations involved herein reflect the specificity which formed the basis for the decisions in *Columbia Gas System, Inc.* v. *United States, supra; Posey* v. *United States, supra;* and *Camiel Thorrez,* 31 T.C. 655, 667 *et seq.* (1958), affd. 272 F. 2d 945 (C.A. 6, 1959). Neither do we have a situation where there was in fact an inconsistent election such as was involved in *Peter Mamula, supra.*

Nor do we think it material that petitioner's election was signified by the filing of a separate document rather than by an amended return. In other situations, separate instruments have been considered sufficient even though the applicable statute or regulations specified that the particular election be made in conjunction with a return. *W. K. Buckley, Inc.* v. *Commissioner, supra;* fn. 34 *supra;* cf. *Paul H. Travis,* 47 T.C. 502, 513–514 (1967), affirmed in part and reversed in part on other grounds 406 F. 2d 987 (C.A. 6, 1969).[37]

We hold that petitioner has made an effective election under section 962.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

[37] See also *Estate of Sam E. Broadhead,* T. C. Memo. 1972–195.