Joseph R. **CLOUTIER,** Mary F. Cloutier, Jack R. Snyder and Merchants National Bank & Trust Company of Indianapolis, Plaintiffs-Appellees,

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

Nos. 82–2219, 82–2220.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 17, 1983.

Decided June 10, 1983.

---

7. This instruction tracks the language of 18 U.S.C. § 641.

Kenneth L. Greene, Indianapolis, Ind., for defendant-appellant.

James D. Kemper, Ice, Miller, Donadio & Ryan, Indianapolis, Ind., for plaintiffs-appellees.

Before CUDAHY and ESCHBACH, Circuit Judges, and ASPEN, District Judge.*

CUDAHY, Circuit Judge.

This appeal arises from judgments of the United States District Court for the Southern District of Indiana in companion cases holding that the income tax assessments issued against and collected from Joseph and Mary Cloutier (the "Cloutiers") and Charles Metzger, as successor trustee of the Grace Hulman Descendants Trust (the "Trust"),[1] were erroneous and that the taxpayers were entitled to refunds. *Cloutier v. United States,* 546 F.Supp. 12 (S.D.Ind. 1982). The United States appeals from the judgment in both cases. We reverse the judgment of the district court in both Numbers 82–2219 and 82–2220.

I

The relevant facts which give rise to these cases are not in dispute. In October of 1966 Joseph Cloutier and Anton Hulman, as trustee of the Trust at that time, each acquired 23% of the stock of Indiana Cable Television, Inc. ("Indiana Cable") for $11,500 (for a combined ownership of 46%). At some point prior to 1970, Joseph Cloutier and Anton Hulman (in his individual capacity and not as trustee of the Trust) also acquired 14% and 80%, respectively, of the stock of the Wabash Valley Broadcasting Corporation ("Wabash Valley"). As of 1970, Joseph Cloutier and Anton Hulman were senior executives and directors of both companies.

In June of 1970, the Federal Communications Commission (the "FCC") adopted regulations prohibiting common control of a television broadcast station and a cable television system in the same community. These regulations also established deadlines for the divestiture of any prohibited interest. The effect of the FCC regulations was to require that Cloutier and trustee Hulman divest their interest either in Indiana Cable or in Wabash Valley. After an unsuccessful effort to obtain a waiver of this requirement from the FCC, the taxpayers each sold their respective interests in Indiana Cable on November 9, 1973. Each taxpayer realized a gain of $486,651.25 on his respective sale.

In early December of 1973 taxpayers filed a request for a ruling from the Internal Revenue Service (the "IRS") concerning

---

* Honorable Marvin E. Aspen, United States District Judge for the Northern District of Illinois, is sitting by designation.

1. By order of this court dated September 13, 1982, Jack R. Snyder and Merchants National Bank and Trust Company of Indianapolis, Indiana, as successor co-trustees of the Trust, were substituted as appellees for Charles W. Metzger, successor trustee.

the applicability of Sections 1071 and 1033 of the Internal Revenue Code, 26 U.S.C. §§ 1033, 1071 (1980), to their sale of the Indiana Cable stock. The IRS issued a ruling on March 28, 1974 which stated that:

Provided that Trust and Joseph [Cloutier] comply with the other requirements of sections 1033 and 1071 of the Code, and provided that the F.C.C. issues the appropriate certification under section 1071, then subject to the provisions of sections 1245(b)(5) and 1250(d)(5), gain on the sale of stock in [Indiana] Cable shall be recognized only to the extent that the amount realized upon the conversion exceeds the cost of qualified replacement property under section 1033(a)(3)(A).

546 F.Supp. at 14. On or before April 15, 1974, the Trust and the Cloutiers then filed their 1973 income tax returns. In their 1973 returns, neither taxpayer reported the gain on the sale of the Indiana Cable stock, nor did either include a statement of election under section 1071 or any other reference to the sale of the stock in their return. Both taxpayers reported income on the cash receipts and disbursements method of accounting, and their taxable year coincided with the calendar year.

On April 29, 1974, the taxpayers petitioned the FCC to issue a tax certificate pursuant to section 1071, and on May 31, 1974, the FCC issued the certificate. On July 31, 1974, the taxpayers each purchased 2,058 additional shares of Wabash Valley for $500,098. Thereafter, the Cloutier, on January 13, 1975, and the Trust, on February 3, 1975, filed amended income tax returns for 1973. These amended returns included statements of "election," under which the taxpayers specifically elected to treat the sale of the Indiana Cable stock as an involuntary conversion and to defer the recognition of the gain realized on those sales under sections 1071 and 1033.

After auditing both taxpayers' returns, the IRS determined that the elections were not timely and proposed that the taxpayers recognize the respective capital gain which they had each realized on the sales of the Indiana Cable stock. The parties were not able to agree on the treatment of this gain, and the IRS asserted a deficiency of $195,653 against the Cloutiers and a deficiency of $204,944 against the Trust. Both taxpayers paid these amounts to the IRS, filed claims for refund, and, after those claims were disallowed, filed suit in the district court for refunds.

In the district court, the taxpayers argued that a timely section 1071 election could be made on an amended return filed after the due date for filing their 1973 returns. The government argued that the taxpayers were not entitled to enjoy the benefits of section 1071 since neither had made the election required under section 1071 in a timely filed return for 1973. The district court found that the government was relying on form rather than substance and ordered the government to refund the tax assessment which had been collected. The court further found that the regulations issued under section 1071 did not explicitly refer to making an election in an "original" or "timely" return, that the taxpayers' December 1973 request for a ruling had given the IRS actual notice of the taxpayers' position, and that the complexities of section 1071 were such that the taxpayers were placed in a "difficult position" by requiring them to make their section 1071 election in their original tax return.

This appeal followed.

## II

There is essentially only one issue presented in this appeal: whether an election pursuant to section 1071 of the Internal Revenue Code may be made on an amended tax return filed after the date on which the original return for the tax year was due.[2]

2. The IRS has, since this case arose, issued a revenue ruling, Rev.Rule 79–277, 1979–2 C.B. 300, which mandates that an election under section 1071 can be made only on a return filed within the time prescribed for filing the original return for the taxable year in which the sale or exchange takes place.

The parties raise a variety of arguments, and there is considerable dispute whether the language of section 1071 itself compels an answer one way or the other. The taxpayers argue that the statute does not, by its terms, explicitly restrict the making of an election to a taxpayer's *original* return. Citing numerous sections of the tax code which *do* make this requirement explicit, the taxpayers conclude that Congress' omission of "clear and unequivocal language" specifying the time for election evidences a lack of congressional intent to require an election in an original return. The government, on the other hand, argues that the plain meaning of section 1071's requirement that the election be made in a "return for the taxable year in which the sale or exchange takes place" is that the election be made in a return that complies with the requirements of the Internal Revenue Code for the appropriate year. Since the Code prescribes the time by which a return must be filed, see 26 U.S.C. § 6072 (1980), the government reasons, no further language to that effect in section 1071 was necessary *unless* the intent of Congress was to allow an election in a return *other* than the original return. The government further notes that the Code sections cited by the taxpayers as evidence of Congress' ability explicitly to restrict certain elections to original returns do not in general require that the election in question be made in the return itself (unlike section 1071 which specifically provides that the election be made in the return for the year of sale). None of these arguments based on the language of the section strikes us as compelling, or even strongly persuasive. The statutory language is somewhat ambiguous, and there is no other evidence of legislative intent which compels one outcome or another.

There also does not appear to be any case precedent that is persuasive on the issue. The taxpayers rely on the recent decision of the United States Tax Court in *Roy H. Parks Broadcasting, Inc. v. Commissioner,* 78 T.C. 1093 (1982). In *Parks,* the taxpayer sold stock of a television broadcasting corporation. Under the law as it stood at the time of the transaction, the taxpayer was not entitled to the FCC certificate required to make a section 1071 election. After a subsequent change in the case law with respect to FCC certification, the taxpayer received a FCC certificate and made a section 1071 election in an amended return filed more than four years after the filing of the original return in which the taxpayer reported the gain on the sale and paid the tax on the gain. The Tax Court upheld the validity of the election made in the amended return, but explicitly limited its decision to the "highly unusual situation" before it. 78 T.C. at 1134. Unlike the case before us, the taxpayer in *Parks* had no opportunity, at the time it filed its original return, to make the election, and, in fact, made its election "at its first opportunity." *Id.* The unique nature of the circumstances in the *Parks* case makes it unpersuasive with respect to the case before us.

Both parties also cite us to cases involving other sections of the Code involving elections. The taxpayers find the rationale of *Bookwalter v. Mayer,* 345 F.2d 476 (8th Cir.1965), a case which concerns elections to report gain under the installment method of section 453, to be particularly relevant. The taxpayers in *Mayer* had a long series of conferences with revenue agents concerning the best method for reporting an installment sale of property and were not advised that it was necessary for them to make an election in their original return for the year of sale. The taxpayers neither received any payments nor reported the income or made any election to use an installment sale reporting method in their original return for the year of the sale. In *Mayer,* the Eighth Circuit interpreted a treasury regulation concerning section 453 to allow an election to be made in an amended return, given the circumstances of the particular case and on the assumption that the late amendment was not inconsistent with any earlier election on original returns with respect to the reporting of profit. Taxpayers also find *Dougherty v. Commissioner,* 60 T.C. 917 (1973), to be persuasive. *Dougherty* involved an election to have earnings of a controlled foreign corporation taxed at cor-

porate rates. But neither of these cases aids us materially in resolving the case at hand. Most importantly, neither *Bookwalter* nor *Dougherty* involves situations where the IRS is particularly disadvantaged by allowing an election to be made in an amended return. As the Tax Court itself noted in *Dougherty,* if there were a situation where an earlier action were inconsistent with the later election, where the ability to make a late election gave the taxpayer a benefit of hindsight which was not intended by Congress and where the IRS was disadvantaged by a lack of disclosure on an original return, different concerns than those which the court faced in *Dougherty* would arise. 60 T.C. at 940–41. Because, as we shall discuss, we find some of these factors to be present in the case before us we do not find *Bookwalter* or *Dougherty* to be strongly persuasive.

■ In the case before us, allowing a section 1071 election to be made in an amended return would present significant problems of administration for the IRS. In the instant case, the IRS received *no* notice of the transaction in question in the taxpayers' original return.[3] To sanction a delay in reporting of this sort would seriously hinder the IRS's efforts to effectively administer the tax laws based on timely receipt of essential information. A delay in reporting would create undesirable opportunities for tax avoidance by taxpayers who fail either to report a transaction or to make an election in the hope that their returns will not be audited before the statute of limitations runs. While there have certainly been no allegations of fraudulent motives in the case before us, we cannot ignore the broader effect of any decision we make. Adopting the taxpayer's proposed procedure of delayed reporting in an amended return would authorize an undesirable reporting method, which could significantly shorten the period between the time the IRS learned of the transaction and the running of the statute of limitation. In the absence

of evidence of impracticability, we will not sanction a procedure which detracts from the timely reporting of transactions. We are also loath, due to the discretionary nature of the amendment process, to sanction a procedure which is dependent upon the filing of an amended return. The filing of an amended return is not a matter of right and has, in fact, repeatedly been held to be a matter which is wholly within the discretion of the Commissioner of Internal Revenue. *See Koch v. Alexander,* 561 F.2d 1115, 1117 (4th Cir.1977); *Miskovsky v. United States,* 414 F.2d 954, 955 (3d Cir.1969). Although not controlling here, an acceptance of the procedure proposed by the taxpayers might have the effect of casting doubt on this well-accepted principle.

■ Further, we have been apprised of no significant disadvantages to taxpayers which would result from requiring a filing of notice of an election under section 1071 in a taxpayer's original return. The taxpayers here have repeatedly asserted that the range of options allowed by section 1071 is so great and so conditioned on late-developing facts that taxpayers require more time than is available prior to the filing of an original return to make an informed election. We do not believe that this assertion is well-founded. As we envision the correct procedure, a taxpayer who has engaged in a transaction which appears to him to be within the ambit of section 1071 has one basic decision to make prior to filing his original return. A taxpayer must simply decide whether she wishes to recognize the gain from the transaction in that year or to defer the recognition under section 1071. Any uncertainty as to availability of a FCC certificate or suitable replacement property need not affect the basic decision to elect. If, once the taxpayer has made a section 1071 election, it is subsequently determined that a FCC certificate is not obtainable the taxpayer's section 1071 election will simply be voided. It is clear that it is not necessary to obtain the FCC certificate prior to election since the treasury regulations implementing section 1071

---

**3.** The request for a ruling from the IRS did not constitute notice to the IRS of the transaction because it did not necessarily indicate to the

IRS that the sale had or would, in fact, take place.

expressly provide that the required FCC certificate should be filed with the election only "when practicable." *See* Treasury Regulations, Sec. 1.1071–4(a). In the event that a FCC certificate is obtained but the taxpayer is unable to obtain suitable replacement property, the taxpayer should have the choice either of voiding the election entirely or of reducing the basis of other depreciable assets he holds (as provided in Treasury Regulations § 1.1071–2(1)(ii) and (iii)). This procedure will alleviate the taxpayer's concern that making an election in his original return will prevent him from being able to take advantage of his full range of options under section 1071 if it subsequently appears that replacement property is unavailable.[4]

### III

For the reasons stated above, the judgments of the district court are REVERSED.

---

4. Treasury Regulation § 1.1071–2(3) states that a section 1071 election, once made, is irrevocable. This regulation is clearly not literally correct since it is evident that, if an election is voided due either to unavailability of replacement property or to failure to obtain a FCC certificate, an election to adjust the basis of replacement property has become impossible of performance and must, in effect, be deemed revoked. We further note that it would be extraordinarily unfair for the IRS to argue, having won the case before us, that a taxpayer who cannot find suitable replacement property after making a section 1071 election in the taxpayer's original return cannot then have the choice of reducing the basis of other assets instead. To the extent that Treasury Regulation § 1.1071–2(3) might conflict with these observations, we think that the regulation would be unenforceable.