CARL B. GRAHAM and CARMOLETA F. GRAHAM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Graham v. Commissioner
Docket No. 25394-82.
United States Tax Court
T.C. Memo 1985-411; 1985 Tax Ct. Memo LEXIS 223; 50 T.C.M. (CCH) 710; T.C.M. (RIA) 85411; August 12, 1985. *223 Held: (1) The Commissioner's determination of deficiencies for 1972, 1973, and 1974 through means of net worth computations is sustained, as modified herein. (2) Part of the underpayment for each year was due to fraud on the part of Ps. (3) The statute of limitations does not bar the assessment and collection of the deficiencies. Sec. 6501 (c)(1), I.R.C. 1954. Jerry A. Wells and James K. Rushing, for the petitioners. William P. Hardeman, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Addition to Tax
Sec. 6653(b)
Year
Deficiency
I.R.C. 1954 [1] *224 1972
$12,560
$6,280
1973
27,805
13,902
1974
4,702
2,351
The issues for decision are: (1) Whether the petitioners understated their taxable income in the amounts determined by the Commissioner through a net worth computation; (2) whether any part of the underpayment of tax for each year was due to fraud within the meaning of section 6653(b); and (3) whether the assessment of deficiencies in income taxes and additions thereto is barred by the statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Carl and Carmoleta Graham, husband and wife, maintained their legal residence in Dallas, Tex., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1972 through 1974 with the Internal Revenue Service Center, Austin, Tex. The petitioners utilized the cash method of accounting. Mr. Graham was born in 1928 in Rule, Tex., a small town located in the western part of the State. He was the son of a sharecropper and moved frequently during his youth. Mr. Graham did not attend school beyond the third grade. As a consequence of his limited education, he can neither read nor write, although he can sign his own name. In 1941, at age 12, Mr. Graham entered the Civilian Conservation Corps because he considered that it paid well (about $30 a month) and it provided him with clothing and a decent place to live. Mr. Graham left the Civilian Conservation Corps in 1942. He worked on a farm in Blytheville, Ark., for about a year, and then did construction work in Stamford, Tex. Stamford *225 is located in west Texas and had a population of about 3,500. Mr. Graham served in the Air Force from 1946 to 1947. He supplemented his Air Force income of $50 (later $75) per month by selling cigarettes, chocolates, and other items, and by gambling. The petitioners were married in 1948. Mrs. Graham was born in 1926 in Kirkland, Tex. She moved at age 9 to O'Brien, Tex., where she completed high school. In O'Brien, Mrs. Graham picked cotton and, at age 13, began working in her father's restaurant. For several months of the year, she ran the restaurant by herself, buying her father's inventory at the beginning of January and then selling any leftover inventory back to him when she closed the restaurant for the summer. By the time she married Mr. Graham in 1948, Mrs. Graham had saved about $7,000 from her restaurant business. After their marriage, the petitioners continued to run the restaurant for over a year. A son was born to the petitioners in about 1950. From 1950 through 1955, the petitioners lived in Stamford, Houston, and Fort Worth. Mr. Graham worked as a carpenter, while Mrs. Graham held jobs in a restaurant and a dime store. In 1955, they moved back to Stamford, *226 where Mrs. Graham opened a second-hand store. The second-hand store eventually was named "Carl's Outlet." Carl's Outlet did a brisk business because it was patronized by braceros, Mexicans who were admitted into the country in large numbers to held pick cotton. Mr. Graham also made money by gambling regularly and heavily with the braceros. In 1966, the petitioners sold Carl's Outlet for a profit of $7,500. They also made a profit of $4,600 on the sale of their house and $3,000 on the sale of boat stalls which Mr. Graham had built. The petitioners moved to Fort Worth, where they opened a used appliance store. Mr. Graham also did carpentry work, and Mrs. Graham sold books door to door. While living in Fort Worth, Mr. Graham met A. L. Carlock, who owned a camper sales lot. The petitioners moved to Dallas in 1968 and opened "Carl's Camper Sales" on a lot on Fort Worth Avenue (Lot 1). In 1969, they opened a second Carl's Camper Sales lot (Lot 2) in Kleberg, Tex., about 15 miles southeast of Dallas. Carl's Camper Sales was operated as a sole proprietorship, and through it, the petitioners engaged in the retail sale of cab-over campers (cab-overs) and pickup truck tops (toppers). *227 A cab-over is a camper which fits on top of a pickup truck, extending over the cab; it is tall enough to stand in and is usually equpped with a refrigerator or icebox and a stove. A topper is placed over the bed of a pickup truck and provides cover for any materials that might be placed in the truck bed. During the years 1972 through 1974, the petitioners sold new cab-overs at prices ranging from $709 to $3,120 and new toppers at prices ranging from $150 to $729. The petitioners also bought and sold used cab-overs and toppers and sold camper accessories, such as air conditioners, fans, gas tanks, jacks, and bumper extensions. Lot 1 was rented from Mr. Carlock for $250 a month. In 1968, the petitioners borrowed $6,000 from the Texas Bank and Trust Company to purchase a mobile home, which was then placed on Lot 1. The mobile home was used as a combined home and sales office until 1971, when the petitioners purchased a new home. Thereafter, the mobile home was used only as an office, except for a period in 1972-1973 when it was occupied by the petitioners' son and daughter-in-law. Lot 2 was located on a piece of property which the petitioners purchased in 1969 from Frank and Ruby *228 Dickey. The purchase price was $30,000, of which $5,000 was paid at the time of sale and $25,000 was financed by the sellers over 15 years at 7 percent per annum. The petitioners regularly paid the $225 per month mortgage payments during the years in issue. The petitioners employed several persons during 1972 through 1974 to assist in the operation of Carl's Camper Sales. Mr. Graham appears to have handled most sales at Lot 1, but he engaged several salesmen, including his son, at different times. He also employed persons to provide special services, such as the installation of air conditioners, gas tanks, and bumper extensions. Lot 2 was managed in 1972 and 1973 by Loyce Dennington, Mrs. Graham's brother. Mr. Dennington worked on a commission basis and was in complete charge of the day-to-day operations of Lot 2. In March 1974, Lot 2 was closed because of declining sales broght on by the oil embargo and rising gas prices; after closing Lot 2, Mr. Dennington began working at Lot 1. Lot 1 and Lot 2 had separate books, records, and bank accounts. Mrs. Graham maintained the records for Lot 1, using a single-entry method of bookkeeping. Working from sales slips prepared when cab-overs *229 and toppers were sold, she periodically listed the sales in a ledger, designating the date of sale, the name of the purchaser, a description of the unit sold (including serial number, if available), the unit's cost, and the sales price. Some entries contained notations indicating that camper accessories (air conditioners, gas tanks, jacks, etc.) were sold in addition to the unit. Expenses were paid either in check or cash and were similarly recorded in the ledger on a periodic basis. The books and records for Lot 2 were maintained by Mr. Dennington. Like Mrs. Graham, he maintained a ledger in which he listed sales and expenses. At the end of the year, he delivered his ledger to Mrs. Graham, and she added up the cost of the units sold at Lot 2 and their sales prices. The petitioners' income tax returns for 1972 through 1974 were prepared by Sue Camplen. Mrs. Camplen was a high school graduate and had completed one year of college, where she took six credit hours of accounting courses. She filled out the petitioners' tax returns on the basis of information contained in yearly "recaps" furnished by Mrs. Graham. On a recap, Mrs. Graham listed items of income and deduction, including *230 the camper business' sales, cost of inventory sold, [2] closing inventory, and expenses. If Mrs. Camplen had a question about any of the information on the recap, she telephoned Mrs. Graham to inquire about it, but Mrs. Camplen never asked to see the petitioners' ledgers or any supporting documentation before she prepared the return. The completed return was then mailed to Mrs. Graham, who examined it before she and Mr. Graham signed it. The petitioners maintained separate business checking accounts for Lot 1 and Lot 2. During 1972 through 1974, there were two checking accounts at the Trinity National Bank, Dallas, Tex., for Lot 1; the first account was closed in July 1973, and the balance in the account was transferred to the second account. Both Mr. and Mrs. Graham has signatory authority over the Lot 1 checking accounts, which were maintained under the name "Carl's Camper Sales." A checking account for Lot 2 was maintained *231 at the Grove State Bank. All of the sales receipts for Lot 2 were deposited into that account. Mr. Graham, Mr. Dennington, and Mr. Dennington's wife had signatory authority over the Grove State Bank account, but Mr. Dennington wrote most of the checks against the account. All bank statements and cancelled checks for the Grove State Bank account were sent to Mr. Dennington at Lot 2. Although Mr. Graham had signatory authority over the Trinity National Bank and Grove State Bank accounts, he never wrote checks because of his inability to read or to write. The Grove State Bank account was closed in 1974. During 1971 through July 1973, the petitioners financed a large part of their cab-over inventory with Commercial Credit Corporation (CCC). Under the floor plan financing arrangement, Mr. Graham ordered from manufacturers the cab-overs which he wished to add to his inventory. Upon delivery of the cab-overs to his lots, he paid the freight charge plus 10 percent of the cab-overs' costs. CCC paid the remaining 90 percent of the costs. When a cab-over was sold by Carl's Camper Sales, CCC was repaid the funds that it had advanced. The petitioners paid CCC interest on the outstanding *232 balance due under the floor plan. Moreover, if a particular cab-over was not sold within a specified period of time, then, under certain contracts, the petitioners were required to increase their equity in that cab-over by paying CCC a specified portion of the 90 percent of the purchase price financed by CCC. This procedure was known as "curtailment." In July 1973, the petitioners paid off the balance then due CCC, $10,432.50, and terminated the floor plan arrangement. The petitioners also purchased a substantial number of cab-overs directly from manufacturers, without financing them under the floor plan, in 1972 through 1974. [3] *233 In addition to cab-overs, the petitioners purchased new toppers and accessories and used cab-overs and toppers during the years in issue. Occasionally, they accepted used items (such as toppers and, in at least once instance, a pickup truck) as part or full payment for a topper or cab-over. The available ledgers for Lot 1 and Lot 2 contain no inventory or purchase accounts. However, Mrs. Graham listed year-end costs for certain types of inventory in her recaps for 1972 through 1974, as follows: 1972
1973
1974
New cab-overs
$3,260.80
[4] *234 $3,974.00
New toppers
Used cab-overs
and toppers
$1,600.00
220.00
675.00
Accessories
1,220.90
987.13
890.00
Total
$2,820.90
$4,467.93
$5,539.00
Total year-end inventories were reported on the petitioners' tax returns as follows: Year
Amount
1971
$4,434.45
1972
2,820.90
1973
[5] 3,480.80
1974
5,539.00 Cab-overs financed by CCC were not included in the closing inventory figures reported on the 1971 and 1972 returns. The petitioners owed CCC $48,054.22 on December 28, 1971, and $31,320.27 as of December 31, 1972. Assuming that there were no curtailment payments prior to such dates, the cost of the inventory covered by the floor plan, and not included on the returns, was about $53,393.00 in 1971 and $34,800.00 in 1972. If in fact the petitioners made curtailment payments, the year-end cost of the floor plan inventory (and, consequently, the petitioners' equity therein) would be even higher. On the 1973 return, the closing inventory figure included the cost ($3,260.80) of new cab-overs remaining from the July 1973 termination of the floor plan. The camper business' sales, cost of goods sold, and expenses, as reported on the petitioners' *235 tax returns for 1972 through 1974, may be summarized as follows: 1972
1973
1974
Gross receipts
$343,327.05
$298,300.25 $221.436.30
Less: cost of
goods sold
302,409.23
271,963.21 197,446.12
Gross profit
$ 40,917.82
$ 26,337.04 [6] $ 23,990.24
Less: business
expenses
(including
depreciation)
27,408.42
29,016.80 21,189.76
Net profit
(or loss)
$ 13,509.40
$ (2,679.76)
$ 2,800.48
The sales and inventory costs reported on the returns cannot be reconciled exactly with the sales and inventory costs listed in the available ledgers of the camper business. The 1972 return cannot be compared with the ledgers because the 1972 ledger for Lot 2 is unavailable. The 1973 return lists gross receipts of $298,300.25 and inventory costs (listed on the return as "purchases" [7]) of $246,080.91, [8] yet the ledgers for Lot 1 and Lot 2 contain sales totaling $300,001.45 and inventory costs totaling $224,918.41. While the record contains two ledgers for 1974, one purportedly from each of the two lots, the sales listed in the ledger for Lot *236 1 are in fact an exact copy of the sales listed in the ledger for Lot 2. Both lots were open during January and February 1974, but the books reflect sales for only one lot during those months. Additionally, the ledger for Lot 1 [9] lists sales totaling $203,000.24 and inventory costing $152,132.05; yet, the 1974 return reported sales of $221,436.30 and inventory "purchases" of $165,938.98. The discrepancies between the ledgers and the returns cannot be explained on the basis of the evidence in the record. The petitioners had several bank accounts before and during the years in issue in addition to their three business checking accounts. In 1966, they opened two savings accounts at the Stamford Federal Savings and Loan Association (Stamford Federal Savings) in Stamford, Tex. Both accounts were opened in the names of both Mr. and Mrs. Graham. One of the accounts was opened in May 1966 with a deposit of $1,400. No further deposite were made to this account, *237 and it was closed in January 1968. The second savings account was opened in February 1966 with a deposit of $600. The account was closed on March 1, 1972, and the account's balance of $790.62 was applied toward the acquisition, on the same day, of a certificate of deposit (CD) at Stamford Federal Savings. The petitioners acquired a total of four CDs from Stamford Federal Savings. The first CD was issued on March 1, 1972, in the face amount of $10,800.00, of which amount, $790.62 was transferred upon the closeout of the petitioners' second Stamford Federal Savings account and $10,009.38 was paid in cash. The second and third of the Stamford Federal Savings CDs were acquired on July 24, 1972. The petitioners deposited $10,000.00 in cash for each. The fourth Stamford Federal Savings CD was acquired on June 25, 1973, wich a check for $10,000. On July 31, 1974, the petitioners closed the four Stamford Federal Savings CD accounts, receiving a check for $41,014.62. With the Stamford Federal Savings check, another check for $8,000.00, and cash of $985.38, they purchased General Motors Acceptance Corporation (GMAC) commercial paper in the form of a $50,000.00 note. The GMAC note earned *238 interest of $1,143.27 as of its maturity date of November 30, 1974. Upon maturity, the petitioners renewed the note for the amount of $51,100. The difference ($43.27) between the amount of interest earned on November 1 and the amount reinvested was paid by check to the petitioners on November 1, 1974. The renewed GMAC note matured on January 30, 1975, at which time interest of $1,100.45 and the principal of $51,100.00 was paid to the petitioners. The petitioners acquired two CDs at the Oak Cliff Savings and Loan Association (Oak Cliff Savings) in Dallas during the years in issue. The first Oak Cliff Savings CD was acquired on May 16, 1972, in the face amount of $10,000, and the second was purchased on October 11, 1973, in the face amount of $30,000. The petitioners acquired the second CD in their names as trustees for their son, Carl Michael Graham, depositing $10,000 in check and $20,000 in cash. In January 1973, the first Oak Cliff Savings CD account was closed, but the second was still open on December 31, 1974. Mrs. Graham maintained a personal checking account at the Trinity National Bank throughout the years in issue. In May 1973, Mr. Graham opened two checking accounts *239 at the Bank of Waldron in Waldron, Ark., depositing $10,000 cash into one account, and $1,000 cash into the other. The accounts were closed in July 1973. In 1974, Mr. Graham opened a third checking account at the Bank of Waldron, and that account was still open at the end of 1974. The petitioners earned interest income on the Oak Cliff Savings and Stamford Federal Savings CDs and the GMAC note of at least $1,294.46 in 1972, $2,709.85 in 1973, and $3,269.79 in 1974. They reported interest income of $279.99 in 1972, $1,466.26 in 1973, and $3,141.14 in 1974. They admit that they did not report the interest earned on the GMAC note on their 1974 return. Under their floor plan arrangement with CCC, the petitioners were required to complete financial disclosure statements periodically. On these statements, they listed "Cash on Hand & in Banks" in the following amounts: Date of Statement
Amount
6/25/69
$17,000.00
7/25/69
14,572.51
3/18/70
13,787.00
10/24/70
20,000.00
5/31/71
39,577.08
12/28/71
36,000.00
4/14/73
48,000.00
They executed a similar financial statement on November 6, 1972, for the Trinity National Bank, on which they listed bank account balances of $47,000, but no cash balance. The petitioners *240 owned the following automobiles at various times during the period 1972 through 1974: Automobile
Acquired
Cost
1963 Chrysler
pre - 1971
$1,000.00
1970 Pickup
unknown
3,300.00
1964 Volkswagen
1969
795.00
1972 Chrysler
1972
6,700.00
1972 3/4 ton Pickup
1972
3,800.00
1973 3/4 ton Pickup
1973
4,050.00
1972 Pinto
1973
1,681.21
1971 Volkswagen
1973
1,253.79
Jeep
1974
1,512.00 On September 30, 1970, the petitioners purchased a lake lot and house, located on Cedar Creek Lake, for $7,500 cash. They sold the Cedar Creek Lake property for $10,000 on April 27, 1972. The gain from the sale was reported on their 1972 tax return. On September 22, 1971, the petitioners purchased a residence at 3207 Adbritain in Dallas, Tex., from Howard F. Cox for $22,614.48. At the time of purchase, they traded in a motor home, valued at $4,500.00, and assumed an $18,114.48 mortgage payable by Mr. Cox to Trinity Mortgage Company of Dallas. The petitioners resided in this house throughout the years in issue and were still living in it at the time of trial. In November 1972, they purchased an 81-acre farm in Boles, Ark., from Albert Dupree. They acquired the farm for $56,500, paying $30,000 down ($16,000 in cash and $14,000 in check) and *241 financing the remaining $26,500 with the seller, Mr. Dupree. At the time of purchase, the Arkansas farm had a house, barn, and corrals, and its 81 acres were completely enclosed by a barbed wire fence. The purchase also included a tractor, a disc harrow and other tools, a horse, and a saddle. After they purchased the farm, the petitioners bought furniture for the farm house costing $3,055.50. The petitioners claimed depreciation deductions for the Arkansas farm house and furniture on their tax returns for 1972 through 1974. The deductions were based on a claim that the Arkansas farm was made available for use by employees and customers of Carl's Camper Sales. On the returns, the house was reported as being devoted 50 percent to business use and its cost basis for depreciation was listed as $20,000 (being 50 percent of $40,000, the farm's cost as reported to Mrs. Camplen on the yearly recaps).The furniture was depreciated as if devoted 100 percent to business purposes, and its cost basis was listed as $3,000. During 1973 and 1974, the petitioners engaged in the buying, raising, and selling of cattle for profit. They used funds from one of their Bank of Waldron checking accounts *242 to purchase the cattle and permitted a man who worked for them on the Arkansas farm to write checks on one of the other Bank of Waldron accounts to buy farm tools, feed, vaccines, and other items for use on the Arkansas farm. The cattle were raised on the Arkansas farm. In 1974, the petitioners acquired a stock trailer costing $1,000 and a utility trailer costing $300 for use on the farm in connection with their cattle-raising activities. On their 1974 tax return, they claimed depreciation deductions with respect to the stock and utility trailers as an expense of their camper business and reported a loss of $2,134.21 from the sale of 25 head of cattle on a Schedule F, Farm Income and Expenses. The petitioners claimed no depreciation deductions on their returns for 1972 through 1974 for items located on the Arkansas farm or used in their cattle-raising activities beyond those depreciation deductions mentioned here. Sometime during 1975, they left the cattle business because of their losses. The petitioners reported adjusted gross income or loss of $15,564.39 in 1972, ($1,213.50) in 1973, and $3,807.41 in 1974. With the application of the standard deduction and allowable exemptions, *243 their taxable income or loss (as reported, or as calculable from their reported adjusted gross income) was $12,064.39 in 1972, ($4,013.50) in 1973, and $1,007.41 in 1974. In March 1975, Raymond Rodriguez, an IRS Revenue Agent, contacted Mr. Graham and informed him that the petitioners' returns for 1972 and 1973 were being examined. On the same day, he met with the petitioners at Carl's Camper Sales Lot 1. Mr. Graham met Mr. Rodriguez when he arrived at Lot 1 and immediately informed him that though "it sounds fishy or funny," some of the petitioners' records had been thrown out earlier that month by some boys who were helping with a remodeling of the petitioners' mobile home office. The petitioners provided Mr. Rodriguez with the available ledgers and bank statements, and he spent more than 2 or 3 days in the petitioners' Lot 1 office examining the records. At his initial interview with the petitioners, Mr. Rodriguez spoke mainly to Mrs. Graham because she handled the petitioners' bookkeeping and records. When asked about the petitioners' checking accounts in 1972 and 1973, Mrs. Graham informed Mr. Rodriguez that they had a business checking account at Trinity National Bank. When *244 asked about savings accounts, she said that they had one account at Oak Cliff Savings. Mrs. Graham further informed Mr. Rodriguez that the $20,000 in currency which they used in 1973 to acquire the $30,000 Oak Cliff Savings CD came from their camper sales business. After the initial interview, Mr. Rodriguez examined the petitioners' bank statements but could not find a withdrawal which would account for the $20,000 in currency used to acquire the Oak Cliff Savings CD. He met with the petitioners a second time in August 1975 and inquired again about the source of the $20,000. At this meeting, Mr. Graham told him that the cash came from the redemption of some CDs at Stamford Federal Savings. Mrs. Graham did not contradict her husband's recollection because she thought he was correct. Mr. Rodriguez had not known of the existence of the Stamford Federal Savings CDs before Mr. Graham referred to them as the source of the $20,000 cash. After the August 1975 meeting, Mr. Rodriguez reviewed ledger cards from Stamford Federal Savings and discovered that the petitioners had had four CDs at that bank. He also discovered that the CDs were not redeemed until after the petitioners acquired *245 the $30,000 Oak Cliff Savings CD. Mr. Rodriguez met with the petitioners a third time in November 1975.At that time, he explained to the petitioners that the redemption of the Stamford Federal Savings CDs could not have furnished the currency used to purchase the Oak Cliff Savings CD, and asked again for the source of the currency. Mr. Graham then claimed that the $20,000 came from cash savings which he had previously accumulated while the petitioners were living in Stamford. Mr. Graham explained that he did not trust banks and that he therefore had kept this cash in his home. He did not tell Mr. Rodriguez that he had saved any more than $20,000 in currency. Sometime after their initial interview, Mr. Rodriguez learned that the petitioners had checking and savings accounts in addition to those which they had told him about. He discovered Mrs. Graham's personal checking account at the Trinity National Bank, the Lot 2 business checking account at the Grove State Bank, and the checking accounts at the Bank of Waldron. He also expanded the scope of his examination to include the petitioners' return for 1974. Mr. Rodriguez referred the examination of the petitioners' income tax returns *246 for 1972 through 1974 to the Criminal Investigation Division of the IRS after the November 1975 interview. The case was assigned to Special Agent Robert Haggerty. Mr. Rodriguez initially assisted Mr. Haggerty in his investigation, but Revenue Agent William G. Owens eventually completed the case with Mr. Haggerty. Mr. Haggerty and Mr. Rodriguez interviewed the petitioners in August 1976 at the Arkansas farm. At that interview, Mr. Haggerty asked the petitioners how much cash they had on hand on December 31, 1971, December 31, 1972, and December 31, 1973. The petitioners responded that they had no more than $800 in cash, on hand, at the end of 1971, 1972, and 1973. They did not mention the $20,000 cash which they had previously told Mr. Rodriguez was the source of the currency used to acquire the Oak Cliff Savings CD. When asked about their checking and savings accounts, the petitioners mentioned the accounts at the Trinity National Bank, Grove State Bank, Bank of Waldron, Oak Cliff Savings, and Stamford Federal Savings, but they did not mention the GMAC note when asked whether they had any notes or accounts receivable. The petitioners were also asked about their purchase of the *247 Arkansas farm in 1972. They told the IRS agents that the farm consisted of 81 acres, a farm house, a barn, and a small amount of farm equipment, and that they had acquired the farm for $40,000, paying $14,000 down and finaning the remaining $26,000 with the seller, Mr. Dupree. Mr. Haggerty later learned through an examination of the local deed records and an interview with Mr. Dupree that the petitioners had paid $56,500 for the farm, paying $16,000 with currency, $14,000 by check, and financing $26,500 with Mr. Dupree. When asked about the automobiles which the petitioners owned during 1972 through 1974, Mr. Graham stated that they had owned only three: a 1972 Chrysler Imperial, a 1973 pickup truck, and a Jeep. Finally, the petitioners revealed in such interview that they had earned a small amount of income from the sale of insurance on campers and trucks which they had not reported on their returns for 1972 through 1974. They explained that the expenses associated with the sale of the insurance exceeded the commissions which they earned (at trial Mr. Graham estimated that the commissions did not exceed $200 for the entire period that they sold insurance), and that, consequently, *248 they had not bothered to report the income. They did not produce any books or records reflecting the insurance transactions, stating that the insurance records were among those records thrown away during the remodeling of their office. At least some of the expenses associated with the insurance business were deducted by the petitioners on their tax returns. In January 1978, the petitioners and their represent-atives--attorney Herb Kendricks and accountant James Howard--met with representatives of the IRS at the IRS District Counsel's office in Dallas. At that conference, Mr. Graham claimed that he had a cash hoard of $55,000 when he moved to Dallas in 1968 and that he kept the cash in a metal Army ammunition box. He further stated that by the end of 1971, he had only about $5,000 to $10,000 left, having invested the remainder in the camper business, property, and bank accounts. He explained that he began putting his money into bank accounts in 1970 when he realized that he was missing out on interest. On April 3, 1979, a grand jury for the Northern District of Texas indicted Mr. and Mrs. Graham for willfully attempting to evade income taxes for the taxable years 1972 through 1974 *249 in violation of section 7201. On July 9, 1979, a jury in the Northern District of Texas acquitted Mr. and Mrs. Graham on all three counts of the indictment. During the course of the criminal trial, Mr. Graham testified that he had a cash hoard of about $55,000 on December 31, 1971, and about $20,000 on December 31, 1972. Special Agent Haggerty prepared a source and application of funds schedule for the years 1968 through 1971 in preparation for the trial of this case. The schedule contains a number of errors acknowledged by the Commissioner. If corrected for such errors, the schedule reveals that during such years, the petitioners made expenditures which exceeded their reported sources of funds by about $79,887. In his notice of deficiency, the Commissioner determined through a net worth computation that the petitioners had unreported taxable income of $34,332 for 1972, $72,509 for 1973, and $17,230 for 1974. The Commissioner further determined that all or part of the underpayments of Federal income tax for each of the years was due to fraud on the part of Mr. and Mrs. Graham. The Commissioner has stipulated to certain adjustments to his net worth computation. At trial, he also *250 moved for leave to amend his answer to conform the pleadings to the proof to include a bank account balance of $10,329.73 in the net worth statement for the year ending December 31, 1972. The parties had previously stipulated to a reduction of $10,329.73 in the 1973 increase in net worth in order to account for the fact that the petitioners' net worth as of December 31, 1972, was understated by such amount, but the Commissioner, in so stipulating and in his notice of deficiency, inadvertently failed to include such amount in net worth for 1972. We granted the Commissioner's motion over the petitioners' objection. The following table (with one correction noted below) reflects the Commissioner's present position with respect to the petitioners' net worth and taxable income for the taxable years 1972 through 1974: 1971
1972
1973
1974
Total assets
$118,170.81
$198,709.64
$242,080.33 $249,060.48
Less: liabilities
45,235.16
69,149.85
61,262.21 53,021.00
accumulated
depreciation
2,054.78
5,420.98
6,253.86 8,766.07
Net worth
$ 70,880.87
$124,138.81
$174,564.26 $187,273.41
Less: net worth of
prior year
70,880.87
124,138.81 174,564.26
Increase (Decrease)
in net worth
$ 53,257.94
$ 50,425.45 $ 12,709.15
Adjustments
7,411.74
12,927.05 9,697.39
Adjusted gross
income as
corrected
$ 60,669.68
$ 63,352.50 $ 22,406.54
Less: itemized
deductions
2,443.41
4,552.58 3,743.81
personal
exemptions
1,500.00
1,500.00 1,500.00
Taxable income as
corrected
$ 56,726.27
$ 57,299.92 $ 17,162.73
Taxable income
(loss) per return
12,064.39
(4,013.50)
1,007.41
Understatement
$ 44,661.88
[10] $ 61,313.42 $ 16,155.32
*251 OPINION The first issue for decision is whether the petitioners understated their taxable income for 1972, 1973, and 1974. The petitioners make several challenges to the correctness of the Commissioner's determination. First, they contend that the Commissioner's application of the net worth method to reconstruct their income was unnecessary and inaccurate, and that the inaccuracies are such as to rebut the presumption of correctness which attaches to the Commissioner's deficiency determination. See Helvering v. Taylor,293 U.S. 507 (1935). The Commissioner may prove the existence and amount of unreported income by any method that will, in his opinion, clearly reflect the taxpayer's income. Sec. 446(b); see Holland v. United States,348 U.S. 121, 130-132 (1954); Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961); Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. The use of the net worth method has long been an acceptable method of proving income. Holland v. United States,supra; *252 Cefalu v. Commissioner,276 F.2d 122 (5th Cir. 1960), affg. a Memorandum Opinion of this Court; Davis v. Commissioner,supra;Lipsitz v. Commissioner,21 T.C. 917 (1954), affd. 220 F.2d 871 (4th Cir. 1955). A presumption of correctness attaches to the Commissioner's determination, and the taxpayer bears the burden of overcoming such presumption and proving that the determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure[11]; Cracchiola v. Commissioner,643 F.2d 1383, 1385 (9th Cir. 1981), affg. per curiam a Memorandum Opinion of this Court; Marcello v. Commissioner,380 F.2d 494 (5th Cir. 1967), affg. on this issue a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). In this case, the petitioners contend that the Commissioner employed the net worth method unnecessarily because the petitioners' books and records were reconcilable with the tax returns and were adequate to determine income. However, use of the net worth method is not confined to situations where the taxpayer has no books or the books are inadequate; the net worth method is not a *253 system of accounting, but is instead proof of income by circumstantial or indirect evidence. "The fact that the taxpayer's books and other records are consistent with his income tax returns or are internally consistent proves nothing more than that they are consistent; it does not establish that they are truthful or accurate." Davis v. Commissioner,supra at 189; see Holland v. United States,supra at 131-132; Bushnell v. Commissioner,49 T.C. 296, 311 (1967) (Raum, J., concurring). Indeed, the net worth method itself may provide "strong evidence that the books are unreliable." Lipsitz v. Commissioner,21 T.C. at 931. Furthermore, the books made available by the petitioners herein were in fact inadequate. The Lot 2 ledger for 1972 is missing, and the Lot 1 ledger for 1974 is merely a copy of the Lot 2 ledger. The ledgers which are available do not reflect the petitioners' inventory purchases or insurance sales transactions and cannot be reconciled with the petitioners' tax returns. We are fully satisfied that the Commissioner was justified in resorting to the net worth method. The petitioners also make numerous challenges to the accuracy of the Commissioner's net worth computations. *254 The petitioners bear the burden of proving any adjustments to the computations, and if the petitioners show that a part of his computations was incorrect, it will not destroy the presumption of correctness which attaches to the remainder of his computations or invalidate his use of the net worth method altogether. Marcello v. Commissioner,supra at 497; Cefalu v. Commissioner,supra at 125; Harper v. Commissioner,supra at 1129. The petitioners' primary attack on the Commissioner's computations is their assertion that, at the beginning of 1972, they had accumulated a cash hoard of about $55,000. They maintain that they spent $35,000 of this cash during 1972 to acquire two CDs and the Arkansas farm, and that they spent the remaining $20,000 in 1973 to acquire the $30,000 Oak Cliff Savings CD. The petitioners claim that the $55,000 was their life savings, accumulated prior to their move to Dallas in 1968. The money allegedly came from Mrs. Graham's savings prior to her marriage; Mr. Graham's selling of Merchandise and gambling while in the Air Force; gambling with the braceros; working as a carpenter; picking cotton; selling their home in Stamford; and operating and selling several *255 small businesses in the years before their move to Dallas. In his net worth computations, the Commissioner credited the petitioners with $800 cash on hand at the beginning of 1972, 1973, and 1974. The petitioners' claim is a common one in cases of this type. In Holland v. United States,348 U.S. at 127, the Supreme Court referred to the claim of opening cash on hand as a "favorite defense." See also Friedberg v. United States,348 U.S. 142 (1954); Cefalu v. Commissioner,supra at 127; Boyett v. Commissioner,204 F.2d 205 (5th Cir. 1953), affg. a Memorandum Opinion of this Court. However, the Supreme Court also recognized that "the correctness of the result depends entirely upon the inclusion in * * * [opening net worth] of all assets on hand at the outset." Holland v. United States,supra at 132. We must therefore never take lightly a taxpayer's contention as to an opening cash accumulation. At trial, Mr. Graham testified that he had a cash hoard of about $55,000 at the beginning of 1972 which he kept in a metal Army ammunition box. He explained that distrusted banks and also preferred to deal in cash because it concealed his inability to read and to write a check. He further *256 testified that he knew he had $55,000 at such time because he counted the money in August or September 1971, when interest rates began going up and he became interested in putting the money into savings accounts. He said he began using his cash in 1972, purchasing a Stamford Federal Savings CD, an Oak Cliff Savings CD, and the Arkansas farm. When the petitioners' counsel first asked Mr. Graham how much he had left at the end of 1972, Mr. Graham testified that he did not think he had anything left by that time. After counsel read that part of Mr. Graham's testimony at his criminal tiral wherein he testified that he "was down to about 20,000" by December 31, 1972, counsel asked Mr. Graham if his answer was "the same now as it was then?", to which Mr. Graham replied, "Probably so." When asked to answer "yes or no," Mr. Graham said "yes." Mrs. Graham also testified to the existence of the cash hoard.She claimed that the cash was kept in the metal Army ammunition box and that the box itself was hidden in various other receptacles: in a cast-iron stove when they lived in Stamford, in a long quilt box when they lived in Fort Worth, in a space behind the drawers of a built-in chest when *257 they lived in the mobile home on Lot 1, and again in the quilt box when they lived in the house on Adbritain. Mrs. Graham testified that there was about $50,000 or $55,000 in the box at the beginning of 1972. Like Mr. Graham, she explained that she remembered the amount because they counted the money, but she could not remember in which month they counted the money. Mrs. Graham could not recall exactly how the cash was spent or how much of it remained at the end of 1972. This Court is not bound to accept testimony at face value even when it is uncontroverted if it is impossible, unreasonable, or questionable. Quock Ting v. United States,140 U.S. 417 (1891); Fleischer v. Commissioner,403 F.2d 403, 406 (2d Cir. 1968), affg. a Memorandum Opinion of this Court; Archer v. Commissioner,227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court; Dougherty v. Commissioner,60 T.C. 917, 932-933 (1973). For the reasons set forth below, we have concluded that the petitioners have not carried their burden of proving that they had a cash hoard of about $55,000 at the beginning of 1972 and $20,000 at the beginning of 1973. The petitioners changed their cash hoard story several *258 times over the course of the Commission's investigation. Revenue Agent Rodriguez first inquired about the petitioners' use of cash in March 1975, when he asked Mrs. Graham where they acquired the $20,000 in currency used to purchase the $30,000 Oak cliff Savings CD. At that time, Mrs. Graham stated that the money came from their camper business. In August 1975, when Mr. Rodriguez explained that he was unable to find a bank account withdrawal which would account for the $20,000 cash, Mr. Graham stated that the cash came from the redemption of the Stamford Federal Savings CDs. When this explanation also proved unworkable, Mr. Graham stated that the cash came funds he had accumulated in his home when working in Stamford. The petitioners now seek to reconcile their inconsistent explanations by claiming that at the first interview in March 1975, Mr. Rodriguez had been asking questions about their Stamford business, Carl's Outlet, immediately before he inquired about the Oak Cliff Savings CD, and that Mrs. Graham therefore was referring to the Stamford business--not the camper business--when she said the money came from their business. Mr. Rodriguez testified that the did not recall *259 that he and Mrs. Graham had been talking about Stamford prior to their discussion of the CD, and we find it improbable that the Revenue Agent would have pursued such an unconnected line of questioning. Moreover, the petitioners' argument does not explain why Mr. Graham, when he was asked about the cash, first stated that the currency came from the redemption of the Stamford Federal Savings SDs, or why Mrs. Graham thought such statement was correct at the time it was made by Mr. Graham. At the August 1976 interview with Special Agent Haggerty and Mr. Rodriguez in Boles, Ark., the petitioners stated that they had only $800 "cash on hand" on December 31, 1971, 1972, and 1973. They attempt to explain the inconsistency between that statement and their current assertion of a currency accumulation of $55,000 on December 31, 1971, and $20,000 on December 31, 1972, by arguing that Mr. Graham understood Mr. Haggerty to be asking about cash "in his pocket" rather than a personal cash hoard. We find this explanation improbable. Both Mr. Haggerty and Mr. Rodriguez testified that the meaning of "cash on hand" was fully explained to the petitioners at the time the question was asked. Furthermore, *260 the fact that Mr. Graham may have misunderstood the question does not explain why Mrs. Graham did not contradict his answer of $800. When the petitioners, their attorney, and their accountant met with representatives of the IRS in 1978, Mr. Graham stated that he had about $55,000 in currency when he moved to Dallas in 1968 and that he had about $5,000 to $10,000 left at the beginning of 1972. Not until he testified at the petitioners' criminal trial in 1979 did Mr. Graham claim to have had $55,000 at the beginning of 1972 and $20,000 at the beginning of 1973. The petitioners' testimony of a cash hoard is essentially uncorroborated. They presented the testimony of Mr. Dennington, who stated that, as far back as 1965, he had heard through "rumor" or "hearsay" that the petitioners had money saved. However, Mr. Dennington further testified that he never knew how much money the petitioners had and that they had never told him that they had cash savings. The petitioners themselves testified that they never told anyone about their cash hoard. They also admitted that they did not disclose its existence on their CCC loan applications. The petitioners defended this secrecy by saying that *261 they had sufficient assets to secure floor plan financing from CCC without revealing their cash hoard. Mrs. Graham testified that "that was our prior savings, before we ever hit Dallas, Texas. * * * And I wasn't mentioning my savings on this financial statement. " The lack of any evidence that the petitioners revealed the existence of the cash hoard to anyone either at the time they were supposedly accumulating it or thereafter casts doubt upon their testimony. Moreover, Mr. Graham's claim that he mistrusted banks and preferred to deal in cash because of his inability to read and to write is contradicted by the fact that the petitioners had at least two savings accounts and two business checking accounts prior to 1972. According to the financial statements which they submitted to CCC, the petitioners maintained substantial balances in these bank accounts prior to 1972. Furthermore, Mr. Graham's conduct during the years in issue suggests no fear of banks or investments entailing paperwork; he acquired six CDs, opened several bank accounts at the Bank of Waldron, and invested $50,000 in GMAC commercial paper. Finally, we are persuaded by the Commissioner's argument that any cash *262 hoard which the petitioners may have possessed when they moved to Dallas in 1968 was probably consumed prior to 1972. The record shows that the petitioners made substantial expenditures in 1968, 1969, 1970, and 1971. According to the source and application of funds schedule prepared by Mr. Haggerty (as corrected for errors pointed out by the petitioners and conceded by the Commissioner), the petitioners' expenditures in such years exceeded their reported sources of funds by about $79,887. While it is not clear where the petitioners obtained the funds for such expenditures, it is certainly possible that they were made from funds in their cash hoard. Thus, even if we accept the petitioners' claim that they had accumulated $55,000 before they moved to Dallas, there is a distinct possibility that such funds were depleted by the end of 1971. Cf. Friedberg v. United States,348 U.S. at 144; United States v. Giacalone,574 F.2d 328, 332 (6th Cir. 1978). Accordingly, we conclude that the petitioners have failed to prove that they had a cash accumulation on December 31, 1971, and December 31, 1972, in excess of the $800 allowed by the Commissioner. See Cefalu v. Commissioner,276 F.2d at 127, *263 and cases cited therein. The petitioners also contend that the Commissioner's net worth computations understated their inventory and liabilities. In his net worth computations, the Commissioner determined that on December 31, 1971, the petitioners owned inventory costing $4,434.45 and that on December 31, 1972, they owned inventory costing $2,820.90. The Commissioner took these inventory figures directly from the closing inventory figures reported on the petitioners' 1971 and 1972 tax returns. The petitioners correctly point out that the reported inventory figures did not include the cost of cabovers financed on the floor plan with CCC. We have found that the petitioners had cab-over inventory costing at least $53,393 at the end of 1971 and at least $34,800 at the end of 1972. In his net worth computations, the Commissioner also omitted from the liabilities figure the amount of the floor plan indebtedness owed by the petitioners to CCC at the end of 1971 and at the end of 1972. The amount of such debt was $48,054.22 on December 28, 1971, and $31,320.17 on December 31, 1972. The difference between the cost of the cab-over inventory and the amount of the indebtedness to CCC at *264 the end of each year represents the petitioners' equity in the inventory ($5,338.78 equity on December 31, 1971, and $3,479.83 equity on December 31, 1972), and the net effect of including the inventory cost and the off-setting floor plan debt in the Commissioner's net worth computations is to increase the petitioners' net worth at the end of each year by the amount of such equity. Ultimately, the inclusion of such amounts will reduce the petitioners' increase in net worth (and, thus, taxable income) in 1972 and 1973. The Commissioner concedes that, ideally, the inventory figure should include the cab-overs financed on the floor plan and the liability figure should include the indebtedness to CCC; however, he contends that these items should be excluded from the net worth computations in the present case because it is impossible to establish the true amount of the petitioners' inventory at the end of 1973 and 1974. He alleges that the petitioners' year-end inventory must have remained fairly constant from 1971 through 1974 in order to have maintained the same level of business and that, therefore, the petitioners must have underreported their closing inventories in 1973 and 1974 *265 when they were not on the floor plan. He contends that the inclusion of the floor plan inventory in 1971 and 1972 net worth would result in a dramatic and artificial drop in year-end inventory from 1971 and 1972 to 1973 and 1974 (i.e., inventory of $57,827.45 in 1971 and $37,620.90 in 1972 to $3,480.80 in 1973 and $5,539.00 in 1974). Consequently, the Commissioner maintains that the closing inventory figures on the petitioners' tax returns should be used in 1971 through 1974. Although the petitioners have not proven their correct year-end inventory figures for any of the years 1971 through 1974, we are persuaded that they have established an error in the Commissioner's inventory and liability figures for 1971 and 1972 and that they have sufficiently proven an increase in both such figures. We are not persuaded that the inclusion of such amounts would significantly or artifically skew the determination of the petitioners' correct taxable income in 1973 and 1974. While the Commissioner asserts that the petitioners' year-end inventories must have remained constant from 1971 through 1974, the only evidence offered to establish this point was the testimony of Mr. Haggerty, who was of *266 the opinion that the inventories must have to have been about the same size throughout such years to remain in business. However, Mr. Haggerty did not visit the petitioners' lot during the years in issue, and other evidence suggests that year-end inventories may well have declined. The petitioners' reported sales declined in 1973 and 1974, and though such sales figures obviously underreported sales, the existence of a downward trend is supported by the fact that the petitioners closed Lot 2 early in 1974 due to a drop in sales brought on by the Arab oil embargo. In addition, the inventory figure for 1973 should be incrased to $4,467.93 to reflect the inclusion of $987.13 of accessories inventory that was inadvertently overlooked when the inventory figures on Mrs. Graham's "recaps" were transferred by the petitioners' return preparer to the 1973 return. With that correction and since the increase in inventory in 1971 and 1972 is largely offset by the increase in liabilities in such years, the effect of the inclusion of the floor plan inventory and liabilities will not significantly affect the determination of the petitioners' increase in net worth in 1973 and 1974. Therefore, *267 we conclude that the Commissioner's net worth computations should be adjusted to reflect an increase in inventory of $53,393.00 in 1971, $34,800.00 in 1972, and $987.13 in 1973, and an increase in liabilities of $48,054.22 in 1971 and $31,320.17 in 1972. The petitioners next contend that the Commissioner erred in not allowing depreciation for certain property which the petitioners claim to have used in their cattle-raising activities. On their tax return for 1974, the petitioners claimed depreciation for a stock trailer and a utility trailer, and these amounts were allowed by the Commissioner in his net worth computation. The petitioners now claim that they are entitled to depreciation in 1973 and 1974 for fencing, corrals, a barn, a tractor, a disc, and other unspecified tools and equipment. The Commissioner has disallowed depreciation of these items for lack of proof that the petitioners were engaged in cattle-raising for a profit and for lack of substantiation. Mr. Graham's uncorroborated testimony provides the only evidence of the cost of the items, most (if not all) of which were included in the $56,500 purchase price of the Arkansas farm. He estimated that the fencing was *268 worth $3,000, the corrals were worth $1,500, the barn was worth $2,500, and the tractor was worth $4,000, but he did not explain how he arrived at such estimates. There is no evidence in the record of the cost of the disc and the other farm equipment, or of the useful life or salvage value of any of the items. Although we have found as a fact that the petitioners engaged in cattle-raising for a profit, we can only conclude, on the meager evidence before us, that they have failed to prove that they are entitled to any depreciation adjustments beyond those allowed by the Commissioner. The petitioners have conceded on brief that they are entitled to no depreciation adjustment with respect to the Arkansas farm house. The petitioners contend that the Commissioner overestimated their living expenses in his net worth computations. The parties have stipulated to the amounts paid by the petitioners for utilities and income taxes in 1972 through 1974. The Commissioner estimated the petitioners' other living expenses on the basis of Bureau of Labor Statistics cost of living figures for a "higher budget" family, concluding that the petitioners spent $4,745.80 in 1972, $5,176.36 in 1973, and *269 $5,702.88 in 1974. The petitioners testified that they lived very conservatively, and Mrs. Graham estimated that their personal living expenses, excluding utilities and income taxes, totaled about $2,450 a year during 1972 through 1974. Mrs. Graham's estimate was uncorroborated by any documentary evidence. The petitioners' professions of a very conservative mode of living is contradicted somewhat by the fact that, during the years in issue, they drove a late model car and purchased and furnished a second home in Arkansas. However, while we are not bound to accept the petitioners' testimony at face value ( Archer v. Commissioner,supra), we think that the Commissioner's use of cost of living figures for a "higher budget" family was inappropriate in the present case. For this purpose, the cost of living adjustment does not include the costs of acquiring the residences or the automobiles. Based on the petitioners' small-town upbringing, the nature of their occupations prior to the years in issue, and their lifestyle, we conclude that their personal living expenses, excluding utilities and income taxes, totaled $3,600 in 1972, $3,780 in 1973, and $3,970 in 1974. On brief, the petitioners *270 have renewed their objection to our granting of the Commissioner's motion to amend his answer to conform the pleadings to the proof to include a bank account balance of $10,329.73 in the net worth statement for the year ending December 31, 1972. They do not deny that the bank account balance existed at such time; in fact, the parties stipulated that the Commissioner's determination of the increase in the petitioners' net worth in 1973 must be reduced by $10,329.73 to account for the Commissioner's inadvertent omission of the bank account balance from the opening net worth figure for 1973. However, the petitioners maintain that, through such stipulation, the parties also stipulated that the bank balance would be disregarded for purposes of determining the petitioners' increase in net worth in 1972. This Court is not bound by the parties' stipulation where the stipulated facts are clearly contrary to facts disclosed by the record. Jasionowski v. Commissioner,66 T.C. 312, 318 (1976), and cases cited therein. Moreover, the stipulation involved in this case dealt with an adjustment to the Commissioner's computation for 1973 and did not specify that the Commissioner could not seek *271 to include the bank balance in 1972. We therefore reaffirm our grant of the Commissioner's motion to amend his answer to include such amount. In summary, the Commissioner's net worth computations are to be corrected in the following manner: December 31, 1971
inventory increased by
$53,393.00
liabilities increased by
$48,054.22
December 31, 1972
inventory increased by
$34,800.00
liabilities increased by
$31,320.17
living expenses reduced by
$ 1,145.80
cash in banks increased by
$10,329.73
December 31, 1973
inventory increased by
$ 987.13
living expenses reduced by
$ 1,396.36
December 31, 1974
living expenses reduced by
$ 1,732.88
In all other respects, the Commissioner's computations (as modified by stipulation) of the amount of the petitioners' unreported taxable income in 1972, 1973, and 1974 are sustained. The second issue for decision is whether any part of the underpayment of tax for any of the taxable years 1972 through 1974 was due to fraud within the meaning of section 6653(b). Such section provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has *272 the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651, 654-655 (3d Cir. 1974); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F.2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 111-112 (1956). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner,55 T.C. 85, 92 (1970). However, fraud may be proved by circumstantial evidence since direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct can often be relied on to establish the *273 requisite fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. The evidence convincingly establishes that Mr. and Mrs. Graham fraudulently underpaid their taxes during each of the years in issue. They furnished the information for, and arranged for the preparation of, the tax returns, and those returns understated taxable income by $41,657.13 in 1972, $57,424.36 in 1973, and $13,435.31 in 1974. Such a consistent pattern of underreporting substantial amounts of income, over a period of several years, standing alone, is highly persuasive evidence of fraud. Adler v. Commissioner,422 F.2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962), affg. a Memorandum Opinion of this Court; Davis v. Commissioner,239 F.2d at 191; Marcus v. Commissioner,70 T.C. 562, 577 (1978), affd. without published opinion 621 F.2d 439 (5th Cir. 1980). We fully recognize that such principle should be applied with caution where the finding of unreported income is based upon a taxpayer's failure to meet his burden of proof. Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971); *274 Otsuki v. Commissioner,supra at 106. However, our finding of fraud in the present case is not based on the petitioners' failure of proof. The petitioners' accountant, James Howard, prepared a net worth computation on behalf of the petitioners which gave them the benefit of every one of the alleged errors in the Commissioner's computation, including an opening cash accumulation of $55,000. If corrected to include the bank balance of $10,329.73 in 1972, Mr. Howard's own calculation reveals the existence of substantial amounts of unreported taxable income in each of the years in issue. The petitioners have offered no explanation for the omissions of such income, strongly suggesting that the omissions were deliberate and not inadvertent or the result of mistake. Stone v. Commissioner,supra at 224-225; Smith v. Commissioner,32 T.C. 985, 987 (1959). Furthermore, there is a considerable amount of other evidence indicating that the petitioners intentionally understated their income and engaged in conduct intended to conceal such income, thereby evading the payment of taxes. The petitioners were under a duty to keep adequate books and records.Sec. 6001; sec. 1.6001-1, Income Tax Regs. *275 Although some of the petitioners' records were apparently accidentally discarded, the ledgers which are available appear to have been the petitioners' principal books of account. The ledgers are clearly inadequate records of the petitioners' actual income, sales, and inventory. The petitioners' failure to maintain adequate records is some evidence of fraud. Harper v. Commissioner,54 T.C. at 1141; Otsuki v. Commissioner,supra at 110. Additional evidence of fraud is found in the petitioners' failure to report any of their insurance sales commissions and a substantial portion of their interest income in each of the years in issue. The petitioners now admit that they did not report the interest earned on the GMAC note in 1974, but both testified that they did not receive a Form 1099 from GMAC. Although the nonreceipt of a Form 1099, when coupled with a taxpayer's limited education, may be a mitigating factor in some cases (see Harper v. Commissioner,supra at 1139), the petitioners' consistent and unexplained failure to report all of their other interest income is indicative of fraud. Moreover, we think it somewhat suspicious that Mrs. Graham testified with great certainty that *276 she had not received a Form 1099 from GMAC, but then could not remember whether or not she reported the interest. Furthermore, the petitioners' false and misleading statements to the IRS agents in the course of the examination evidence an intent to conceal income and evade the payment of tax. United States v. Newman,468 F.2d 791, 794 (5th Cir. 1972); Estate of Upshaw v. Commissioner,416 F.2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court; Smith v. Commissioner,supra at 987. They gave Mr. Rodriguez a series of shifting stories to account for the source of the currency used to acquire the $30,000 Oak Cliff Savings CD, and they failed to inform him of all their checking and savings accounts. When they met with Mr. Haggerty, they told him that they had owned only three automobiles during the years in issue although they actually had owned nine. They also told the IRS agents that they had paid only $40,000 for the Arkansas farm, concealing the $16,000 which they had paid in cash. Finally, the petitioners attempted to mislead the agents and this Court with a cash hoard story that was obviously concocted after the fact to explain the underpayments. The petitioners' *277 testimony presents a pattern of excuses and explanations for the statements, or omissions from the statements, which they made to the Commissioner's agents. Taken in isolation, any one of these explanations might be believable, but taken as a whole, they are unsatisfactory and even contradictory. For example, as previously mentioned, the petitioners' explanation of their shifting stories with respect to the currency used to acquire the Oak Cliff Savings CD may reconcile Mrs. Graham's statement that the cash came from "the business" with Mr. Graham's statement that the cash came from their savings in Stamford, but it does not explain why Mr. Graham first said the cash came from the redemption of CDs. Similarly, Mrs. Graham explained her failure to tell Mr. Rodriguez about all of their checking accounts with a different excuse for each account: She did not mention her own checking account at Trinity National Bank because it was her personal account, and it was not used for the camper business; she did not mention the Lot 2 checking account at the Grove State Bank because Mr. Dennington had charge of it, and she never wrote checks on it; and she did not mention the Bank of Waldron *278 checking accounts because she thought they were closed at the time of the interview in 1975. It defies credulity that, when asked what checking accounts the petitioners had in 1972 and 1973, Mrs. Graham would have a different reason for failing to mention each of the omitted accounts. The peltitioners point out that Mr. Rodriguez stated at trial that they were "very good people," and that their books and records reflected "someone that was just trying to keep [a] record of what is happening in that business." Contrary to the petitioners' contention on brief, the statements of Mr. Rodriguez do not negate the existence of fraud. Otherwise "good people" have been known to intentionally seek to evade the payment of taxes which they knew or believed to be owing. Although the petitioners, particularly Mr. Graham, did not possess much formal education, both Mr. and Mrs. Graham were experienced in handling money, having owned and operated several businesses over the course of their lifetimes. While her lack of formal training in accounting may have led Mrs. Graham to make a few unintended mistakes in her recordkeeping, we do not believe that the petitioners' underreporting of income was *279 due merely to negligence (cf. Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. and remanding 40 B.T.A. 424 (1939)); we are convinced that both Mr. and Mrs. Graham were aware of their obligation to report all of their income and that they intentionally failed to do so during each of the years in issue. Finally, the petitioners spent large amounts of cash during 1972 through 1974, opening substantial bank accounts, buying automobiles and a farm, and investing in cattle. We simply cannot believe that the petitioners could spend so much money without realizing that they had substantially understated their income on the tax returns. In our view, the petitioners' substantial underreporting of income, their failure to provide any plausible explanation for such underreporting, and their deceptive conduct during the investigation and at trial, all clearly demonstrate that the underpayments of tax were due to fraud. Consequently, we hold that the Commissioner has proven, by clear and convincing evidence, that some part of the underpayment of tax for each year was due to fraud within the meaning of section 6653(b). The last issue for decision is whether the assessment and *280 collection of deficiencies for each of the years in issue are barred by the statute of limitations. Since the Commissioner has sustained his burden of proving fraud for each year, the statute of limitations remains open under section 6501(c)(1). Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976); Harper v. Commissioner,supra at 1142. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.
2. It appears that the petitioners did not maintain inventories as required by sec. 481; in the ledgers and recaps, Mrs. Graham totaled the cost of camper units actually sold during each year, but there is no evidence of the petitioners' total purchases in each year.↩
3. It is impossible to determine from the books and records which are in evidence exactly how many cab-overs were purchased off the floor plan. However, it is clear that the number was substantial. For example, the petitioners paid CCC about $68,210 from Feb. 11, 1972, to the end of that year. Such amount would reflect sales of inventory costing about $75,789 (assuming no curtailment payments were made during the year). According to the ledger for Lot 1, cab-overs costing $72,749.53 were sold on that lot in 1972. The 1972 ledger for Lot 2 is unavailable, but since the reported sales for Lot 2 exceeded those of Lot 1, it may be assumed that similar cab-over costs were incurred on that lot. Furthermore, the 1973 ledger for Lot 2 (which is available) reflects the purchase, without use of the floor plan, of numerous cab-overs. From July 1973 through 1974, the petitioners were no longer buying cab-overs under the floor plan.
4. On the 1974 recap, Mrs. Graham wrote that there were "UNITS-NEW" of $3,974 left over at the end of the year. It appears that the word "units" was intended to cover both cab-overs and toppers. 5. In preparing the 1973 return, the year-end inventory of accessories listed on the 1973 recap ($987.13) was apparently overlooked in computing total closing inventory.↩
6. Gross profit for 1974 in fact computes to $23,990.18, not $23,990.24 as reported on the petitioners' 1974 tax return. As a consequence, net profit for the year, as reported, should be $2,800.42.↩
7. See n. 2, supra.↩
8. If corrected for two unintended, computational errors made by Mrs. Graham, this figure would be $224,218.41. ↩
9. The Lot 1 ledger appears to have been the ledger used by Mrs. Graham in preparing her 1974 recap.↩
10. In computing the understatement of taxable income for 1973, the Commissioner mistakenly subtracted $4,013.50 from $57,299.92, thus, computing the understatement as $53,286.42.↩
11. Any reference to a Rule is to the Tax Court Rules of practice and Procedure.↩